Per Curiam:
This case was referred pursuant to Buie 45(a) to Mastin G. White, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law which the commissioner has done in a report filed July 13, 1959. Although plaintiffs did file an intention to except to the commissioner’s findings and recommended conclusion of law, they did not within the time permitted by the rules of this court file exceptions and brief. The defendant therefore on October 9, 1959, filed a motion for judgment in accordance with the commissioner’s report, to which motion plaintiffs filed a response of no objection.
Upon consideration thereof, together with the record made, the court being in agreement with the findings and conclusions made by the commissioner hereby adopts the same, as hereinafter set forth, as the basis for its judgments in this case. Judgment is entered for defendant on its counterclaim against the plaintiffs, jointly and severally, in the sum of $3,484.36, after making allowance for the sum of $275.36 to which plaintiffs are entitled, together with interest as provided by law on the sum of $3,759.72. Judgments are likewise entered for defendant on its counterclaims against plaintiff Sol Cutler individually in the sum of $130.17, together with interest thereon as provided by law, and against plaintiff Jerry Librach individually in the sum of $8,228.72, together with interest thereon as provided by law.
It is so ordered.
OPINION OF COMMISSIONER
The plaintiffs, Jerry Librach and Sol Cutler, who in 1954 were partners engaged hi the manufacture of clothing under the trade name of Acme Sportswear Company, sue because the Government allegedly breached a contract which the *607 plaintiffs and the Government (represented by a contracting officer of the Philadelphia Quartermaster Depot, Department of the Army) had entered into on September 3, 1954. The Government asserts counterclaims based upon taxes allegedly due and unpaid by the plaintiffs.
Under the contract referred to in the preceding paragraph, the plaintiffs were to manufacture and deliver to the Army 178,080 pairs of men’s cotton trousers at a unit price of 51 cents per pair, or a total consideration of $90,820.80. The contract provided that the cloth to be used in manufacturing the trousers would be furnished to the plaintiffs by the Government, and that “The Government will endeavor to make initial delivery of Government furnished material within at least 45 calendar days prior to the first scheduled delivery date.” The “first scheduled delivery date” specified in the contract was November 3,1954, so that the Government was obligated to “endeavor” to make the initial supply of cloth available to the plaintiffs on or before September 19,1954.
The contract contained a provision numbered 38 and entitled “Termination for Convenience of the Government.” This provision stated (among other things) as follows:
a. The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interests of the Government. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.
At the time when the contract previously mentioned was entered into, the plaintiffs were principally engaged in the manufacture of ladies’ sportswear. However, upon learning on or about September 3, 1954 that the Army contract had been awarded to them, the plaintiffs immediately began to make preparations for the manufacture of the men’s cotton trousers in accordance with the contract. This involved purchasing an additional cutting table, some special attachments, and a supply of trimmings (thread, buttons, and *608 packing supplies), and rearranging equipment in the plaintiffs’ plant. Also, the plaintiffs declined for a time to accept further orders from private concerns for the manufacture of civilian clothing, since the performance of the Army contract was expected to require the use of the plaintiffs’ entire equipment and personnel for a 3-month period. As a result of these actions by the plaintiffs, they were soon ready to begin manufacturing trousers for the Army in accordance with the contract, except for the cloth that was to be furnished by the Government.
On September 24, 1954, while the first consignment of Government-owned cloth to be used by the plaintiffs in the performance of the Army contract was en route to the plaintiffs’ plant, personnel of the Philadelphia Quartermaster Depot informed the plaintiffs over the telephone that their Army contract was being terminated for the convenience of the Government. At about the same time, personnel of the depot caused the shipment of Government-owned cloth to be diverted to another destination, so that it did not reach the plaintiffs’ plant.
Formal notification relative to the termination of the plaintiffs’ Army contract was furnished to them by means of a telegram and a letter, both dated September 27, 1954. The telegram, which was signed by the contracting officer, stated (among other things) that “Your contract * * * is hereby terminated in its entirety pursuant to Article 38 * * * entitled ‘Termination for Convenience of the Government’ cma effective immediately,” and that a letter was to follow. The letter of the same date confirmed the telegram.
After an audit of the plaintiffs’ records had been made by the Army, and as a result of negotiations between the plaintiffs and the contracting officer that extended over a substantial period of time, the plaintiffs and the Government entered into a supplemental agreement dated September 15, 1955 respecting the amount of the compensation that should be paid to the plaintiffs because of the termination of their Army contract. This agreement, under which the . Government paid to the plaintiffs the sum of $4,993.57, provided that such sum “constitutes payment in full and complete settlement of the amount due the Contractor with *609 respect to the terminated portion of the Contract,” except for the portion of the plaintiffs’ claim based upon anticipated profit.
In their negotiations, the plaintiffs and the contracting officer were unable to agree on the amount representing profit that was properly allowable to the plaintiffs. The plaintiffs contended that if they had been permitted to perform the contract, they would have made a net profit of 14 cents on each of the 178,080 pairs of trousers produced under the contract, and, accordingly, that they should be paid $24,-931.20 to cover their anticipated profit, in view of the termination of the contract by the Government without any fault on their part. The contracting officer, on the other hand, took the position that the plaintiffs were entitled to a profit allowance of only $275.36. This figure of $275.36 presumably represented the result of the contracting officer’s calculations in applying to the plaintiffs’ cost data, as agreed to by the parties, the portion of article 38 of the contract which provided that, in the event of the termination of the contract for the convenience of the Government, the plaintiffs (in addition to other items of reimbursement) would receive as profit “A sum equal to 2% of * * * the cost of articles and materials not processed by the Contractor, plus a sum equal to 8% of the remainder of” the plaintiffs’ costs, but that the aggregate amount payable to the plaintiffs as profit should not exceed 6 percent of the total costs incurred by the plaintiffs.
Because of the inability of the plaintiffs and the contracting officer to agree on this point, the supplemental agreement of September 15, 1955 reserved the plaintiffs’ rights with respect to their claim for anticipated profit. The position of the contracting officer relative to this matter was subsequently upheld by the Armed Services Board of Contract Appeals.
In the petition filed by the plaintiffs with this court, they not only allege that they were deprived of the profit that they would have made on the garments that they would have manufactured for the Army if the contract had not been terminated, but they also assert against the defendant a claim in the amount of $9,000 based upon an alleged decline in *610 their business with civilian concerns because of their involvement in the Army contract, and a claim in the amount of $1,985.72 because of expenses allegedly incurred by the plaintiffs during the period when their Army contract was in effect and for which they were not reimbursed under the supplemental agreement of September 15,1955. However, as the supplemental agreement of September 15, 1955 between the plaintiffs and the Government specifically provided that the sum of $4,993.57 paid to the plaintiffs under that agreement “constitutes payment in full and complete settlement of the amount due the Contractor with respect to the terminated portion of the Contract,” except for the matter of anticipated profit, the supplemental agreement is a complete bar to a recovery by the plaintiffs for anything other than the element of anticipated profit. Canal Dredging Company v. United States, 99 C. Cls. 235, 260 (1943).
Whether the plaintiffs are entitled to recover as damages in this action an amount equivalent to the profit that they would have made on the manufacture of 178,080 pairs of trousers if their Army contract had not been terminated, or whether the contracting officer was correct in taking the position that the plaintiffs’ profit allowance should be computed in accordance with the formula prescribed in article 38 of the contract, depends upon whether the termination of the contract breached it or merely constituted an exercise by the Government of the right to terminate conferred on the Government by article 38. As this court said in Davis Sewing Machine Co. v. United States, 60 C. Cls. 201, 217 (1925), affirmed 273 U.S. 324:
* * * Profits * * * are only recoverable as part of the damages claimed for a breach of the contract by preventing its fulfillment according to its terms. Upon proof of a breach of a contract by its illegal termination and proof that he was ready and willing to perform, the party would be entitled to nominal damages; and if he proceeds further to prove his damage by reason of the breach, and shows that he would have made a profit had he been allowed to carry the contract to completion, he will be allowed a recovery for profits as a part of his damages. * * * If, then, there has been no breach, there can be no recovery of damages or of profits as a part thereof. * * *
*611 In support of their contention that the termination of their Army contract amounted to a breach of the contract by the Government, rather than an exercise by the Government of the right to terminate granted in article 38 of the contract, the plaintiffs refer, in the first instance, to the language used in article 38, i.e., “The performance of worh under this contract may be terminated by the Government * * * whenever the Contracting Officer shall determine that such termination is in the best interests of the Government” (emphasis supplied). The plaintiffs argue that the “performance of work” under their Army contract was never begun because the Government failed to provide any cloth for use in manufacturing the trousers called for by the contract, and, hence, that article 38 of the contract never became operative and the contracting officer’s purported exercise of the right to terminate under that article was ineffective. The actual termination of the contract, according to the plaintiffs, was brought about by the Government’s failure, in breach of an obligation imposed upon the Government by the contract, to furnish cloth needed by the the plaintiffs for use in manufacturing the trousers.
With respect to the argument mentioned in the preceding paragraph, it should be noted that the plaintiffs, before anything was said by the Government about terminating the contract, had done a substantial amount of work in getting ready to manufacture the trousers called for by the contract. They had purchased an additional cutting table, special attachments, and essential supplies, and they had rearranged equipment in their plant. It would seem that these activities, although they did not culminate in the actual manufacture of any trousers, might be said to constitute the “performance of work” under the contract. In any event, it has been held that the right to terminate a contract for the convenience of the Government, under a provision such as article 38 of the contract with which we are concerned in this case, may be exercised at will and “includes the possibility of a termination before any of the articles contracted for are completed” (Davis Sewing Machine Co. v. United States, supra, at p. 217). In my opinion, it would be unreasonable to hold that the Government, having concluded *612 prior to the beginning of manufacturing operations that a contract similar to the one involved in this case ought to be terminated in the public interest, must wait until after the manufacture of the goods has begun before exercising the right to terminate. The application of such a rule would frequently result in unnecessary trouble and expense both to the G-overnment and to the contractor.
As an alternative reason for contending that there was no valid exercise by the Government in this case of the right to terminate conferred by article 38 of the contract, the plaintiffs allege in the petition that the purported termination under article 38 was done “in bad faith, * * * on the pretext that it was for the ‘convenience of the Government,’ when in reality said contract was canceled so that the defendant might award the same to someone else.” The record is devoid of any evidence supporting this allegation that the plaintiffs’ contract was canceled by the Government in order that the business might be given to some other person or persons. Hence, this court is required to apply the rule that, in the absence of clear evidence to the contrary, it must be presumed that the public officials involved in the termination of the plaintiffs’ contract were acting conscientiously in the discharge of their duties when the contract was terminated for the purported convenience of the Government. United States v. Chemical Foundation, 272 U.S. 1, 14-15 (1926); New River Mineral Co. v. Roanoke Coal & Coke Co., 110 Fed. 343, 345 (C.A. 4, 1901); see Elizabeth P. Knotts v. United States, 128 C. Cls. 489, 492 (1954).
One naturally sympathizes with the plaintiffs because they (together with certain other private persons) were compelled, as outlined below, to bear the brunt of a miscalculation by the Office of the Quartermaster General concerning the Army’s need for men’s cotton trousers.
The plaintiffs’ contract and contracts with three other garment manufacturers were entered into by the Philadelphia Quartermaster Depot during the period August 10-September 3, 1954 in order to procure a total of 410,970 pairs of men’s cotton trousers. These contracts were made pursuant to a procurement directive from the Office of the Quartermaster General.
*613 On September 17, 1954, the Deputy Chief of Staff for Logistics of the Army directed, the Quartermaster General to recompute the requirements of the Army for certain items, and also to “Examine all outstanding procurement now under contract and cut 'back that quantity not authorized for 'procurement wader current directives which can be eliminated without excessive termination costs” (emphasis in original). Pursuant to these instructions, the Office of the Quartermaster General recomputed the requirements of the Army for men’s cotton trousers (among other items). As a result of such review, it was concluded that the Army would not need an additional supply of men’s cotton trousers within the reasonably near future. Accordingly, the Office of the Quartermaster General canceled the procurement directive mentioned in the preceding paragraph and informed the Philadelphia Quartermaster Depot that all the contracts previously made pursuant to such procurement directive should be terminated. Thereupon, the Philadelphia Quartermaster Depot terminated the plaintiffs’ contract and the other contracts referred to in the preceding paragraph.
The conclusion of the Office of the Quartermaster General in September 1954 that no additional men’s cotton trousers would be needed within the reasonably near future was erroneous. Following another review of the Army’s requirements for such garments, the Office of the Quartermaster General on February 21, 1955 issued a new procurement directive to the Philadelphia Quartermaster Depot for the procurement of 1,287,020 pairs of such trousers. Pursuant to the new procurement directive, an invitation for bids was issued by the Philadeljrhia Quartermaster Depot on March 31, 1955; and contracts were subsequently entered into with clothing manufacturers for the procurement of approximately 1,200,000 pairs of men’s cotton trousers. The unit pi’ices paid by the Government under such contracts were higher than the unit prices that had been provided for in the plaintiffs’ contract and the other contracts for men’s cotton trousers made by the Philadelphia Quartermaster Depot in August and September of 1954.
There is no evidence in the record indicating that the miscalculation by the Office of the Quartermaster General in *614 September 1954 concerning the Army’s need for men’s cotton trousers was motivated by bad faith or caprice, or that it was anything other than an honest mistake based upon incomplete data. That the Army officials involved in the transaction were not actuated by animus toward the plaintiffs is shown by the fact that all the contracts for men’s cotton trousers that had been made in August and September of 1954 — and not merely the plaintiffs’ contract — were terminated, and by the further fact that the plaintiffs were afforded an opportunity to submit a bid in connection with the procurement of men’s cotton trousers under the new procurement directive dated February 21,1955. The plaintiffs elected not to bid on the new work.
It is unfortunate that the plaintiffs, as a result of the miscalculation by the Office of the Quartermaster General, were deprived of the opportunity to complete their contract and to endeavor to make a substantial profit on the manufacture of 178,080 pairs of trousers. However, by agreeing to include article 38 in the contract, the plaintiffs placed in the hands of the Government the discretionary authority to terminate the contract at will, and the plaintiffs agreed that, in the event of such termination, their profit allowance should be computed in accordance with the formula prescribed in article 38. In the absence of clear and convincing proof that article 38 was included in the contract as the result of a mutual mistake, or as the result of misrepresentation, deceit, fraud, or duress practiced upon the plaintiffs by representatives of the Government — and no such contention is made by the plaintiffs — this court has no basis for permitting the plaintiffs to escape the consequences of their act in agreeing to the provisions of article 38.
For the reasons indicated above, it appears that the plaintiffs are entitled to no more than the sum of $275.36 offered to them as a profit allowance by the contracting officer under article 38 of the contract.
The uncontested evidence in support of the defendant’s counterclaims shows that, because of taxes due and unpaid by the plaintiffs, the Government has a valid claim against the plaintiffs, jointly and severally, in the amount of $3,759.72, plus interest, an additional valid claim against *615 the plaintiff Sol Cutler in the amount of $130.17, plus interest, and an additional valid claim against the plaintiff Jerry Librach in the amount of $8,228.72, plus interest.
FINDINGS OF FACT
Findings Relative to Plaintiffs’ Claim
1. The plaintiffs, Jerry Librach and Sol Cutler, are citizens of the United States. At all times material to this litigation, the plaintiffs were copartners trading as the Acme Sportswear Company. That company, which had its principal place of business in Benton, Kentucky, was engaged in the manufacture of clothing. The company’s factory in Benton had approximately 35,000 square feet of space and was well equipped. The cutting machines, cloth spreaders, and various kinds of sewing machines in the plant totaled approximately 165, or perhaps more, pieces of equipment.
2. On June 9, 1954, the New York Quartermaster Purchasing Agency, pursuant to the authority contained in procurement directive No. NY 1-0033-00-5-07 from the Office of the Quartermaster General of the Army, issued invitation No. QM-30-322-54-573, calling for bids on the manufacture and delivery to the Army of 410,970 pairs of men’s cotton trousers. By means of an addendum dated July 2, 1954, prospective bidders were informed that bids should be submitted to the Philadelphia Quartermaster Depot. In response to the invitation for bids, the plaintiffs submitted a bid on July 12,1954, wherein they proposed to produce and furnish 178,080 pairs of trousers at a unit price of 51 cents per pair. On September 3,1954, the plaintiffs were awarded contract No. DA-36-030-QM-442'8 by the Philadelphia Quartermaster Depot for the manufacture and delivery of 178,080 pairs of trousers at the bid price of 51 cents per pair, or a total contract price of $90,820.80. The contract was signed on behalf of the United States by Major George F. Mould, QMC, of the Philadelphia Quartermaster Depot, as contracting officer.
3. In response to bids submitted in accordance with invitation No. QM-30-322-54-573, referred to in finding 2, the Philadelphia Quartermaster Depot awarded to the Big Ace *616 Corporation, Athens, Georgia, on August 10,1954 a contract for the manufacture and delivery of 90,000 pairs of men’s cotton trousers for a total consideration of $50,400, to the Selma Garment Company, Selma, Alabama, on September 8,1954 a contract for the manufacture and delivery of 80,000 pairs of men’s cotton trousers for a total consideration of $45,800, and to Nunnally & McCrea Company, Atlanta, Georgia, on September 3,1954 a contract for the manufacture and delivery of 62,890 pairs of men’s cotton trousers for a total consideration of $37,482.44.
4. It was provided in contract No. DA-36-030-QM-4428, and also in the contracts referred to in finding 3, that the cloth to be used in manufacturing the trousers would be furnished to the respective contractors by the Government. In this connection, it was stated in each of the four contracts as follows:
* * * The Government will endeavor to make initial delivery of Government furnished material within at least 45 calendar days prior to the first scheduled delivery date. Each such delivery period will be extended by the number of calendar days that the initial delivery of the Government furnished material is delayed.
The “first scheduled delivery date” specified in contract No. DA-36-030-QM-4428 was November 3, 1954.
5. Contract No. DA-36-030-QM-4428 contained the following provisions (amongothers) :
12. DISPUTES
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be *617 afforded an opportunity to be beard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
* * * * *
38. TERMINATION EOR CONVENIENCE OE THE GOVERNMENT
a. The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interests of the Government. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.
;]< # * % #
c. After receipt of a Notice of Termination, the Contractor shall submit to the Contracting Officer its termination claim, in the form and with the certification prescribed by the Contracting Officer. Such claim shall be submitted promptly but in no event later than two years from the effective date of termination, unless one or more extensions in writing are granted by the Contracting Officer, upon request of the Contractor made in writing within such two-year period or authorized extension thereof. However, if the Contracting Officer determines that the facts justify such action, he may receive and act upon any such termination claim at any time after such two-year period or any extension thereof. Upon failure of the Contractor to submit its termination claim within the time allowed, the Contracting Officer may determine, on the basis of information available to him, the amount, if any, due to the Contractor by reason of the termination and shall thereupon pay to the Contractor the amount so determined.
d. Subject to the provisions of paragraph c, the Contractor and the Contracting Officer may agree upon the whole or any part of the amount or amounts to be paid to the Contractor by reason of the total or partial termination of work pursuant to this clause, which amount or amounts may include a reasonable allowance for profit on work done. The contract shall be amended accordingly, and the Contractor shall be paid the agreed amount. Nothing in paragraph e of this clause, prescribing the amount to be paid to the Contractor in the *618 event of failure of the Contractor and the Contracting Officer to agree upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this clause, shall be deemed to limit, restrict, or otherwise determine or affect the amount or amounts which may be agreed upon to be paid to the Contractor pursuant to this paragraph d.
e. In the event of the failure of the Contractor and the Contracting Officer to agree as provided in paragraph d upon the whole amount to be paid to the Contractor by reason of the termination of work pursuant to this clause, the Contracting Officer shall determine, on the basis of information available to him, the amount, if any, due to the Contractor by reason of the termination and shall pay to the Contractor the amounts determined as follows:
(1) For completed supplies accepted by the Government * * * and not theretofore paid for, a sum equivalent to the aggregate price for such supplies computed in accordance with the price or prices specified in the contract, appropriately adjusted for any saving of freight or other charges;
(2) The total of — (i) The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto, but exclusive of any costs attributable to supplies paid or to be paid for under paragraph e(l) hereof; (ii) the cost of settling and paying claims arising out of the termination of work under subcontracts or orders, * * * which are properly chargeable to the terminated portion of the contract (exclusive of amounts paid or payable on account of supplies or materials delivered or services furnished by subcontractors or vendors prior to the effective date or the Notice of Termination, which amounts shall be included in the costs payable under (i) above); (iii) A sum equal to 2% of that part of the amount determined under (i) which represents the cost of articles and materials not processed by the Contractor, plus a sum equal to 8% of the remainder of such amount, but the aggregate of such sums shall not exceed 6% of the whole of the amount determined under subdivision (i) above, which amount for the purpose of this subdivision (ii) shall exclude any charges for interest on borrowings; provided however, that if it appears that the Contractor would have sustained a loss on the entire contract had it been completed, no profit shall be included or allowed under this subdivision (iii) and an appropriate adjust *619 ment shall be made reducing the amount of the settlement to reflect the indicated rate of loss.
(3) The reasonable costs of settlement, including accounting, legal, clerical, and other expenses reasonably necessary for the preparation of settlement claims and supporting data with respect to the terminated portion of the contract and for the termination and settlement of subcontracts thereunder, together with reasonable storage, transportation, and other costs incurred in connection with the protection or disposition of property allocable to this contract. The total sum to be paid to the Contractor under (1) and (2) of this paragraph e shall not exceed the total contract price as reduced by the amount of payments otherwise made and as further reduced by the contract price of work not terminated. * * *
f. Any determination of costs under paragraph c or e hereof shall be governed by the Statement of Principles for Consideration of Costs set forth in Part 4 of Section VIII of the Armed Services Procurement Eegulation, as in effect on the date of this contract.
g. The Contractor shall have the right of appeal, under the clause of this contract entitled “Disputes,” from any determination made by the Contracting Officer under paragraphs c or e above, except that if the Contractor has failed to submit its claim within the time provided in paragraph c above and has failed to request extension of such time, he shall have no such right of appeal. In any case where the Contracting Officer has made a determination of the amount due under paragraph c or e above, the Government shall pay to the Contractor the following: (i) if there is no right of appeal hereunder or if no timely appeal has been taken, the amount so determined by the Contracting Officer, or (ii) if an appeal has been taken, the amount finally determined on such appeal.
6. (a) At the time when contract No. DA-36-030-QM-4428 was entered into in September 1954, the plaintiffs were principally engaged in the manufacture of ladies’ sportswear, consisting of slacks, pedal pushers, blouses, dresses, and shorts. The plaintiffs customarily realized a net profit of approximately 9 percent on the dollar volume of business that they did in manufacturing such garments and other items for civilian wear.
*620 (■b) Prior to entering into contract No. DA-36-030-QM-4428, tbe plaintiffs had produced jacket liners and trousers for the Army under another contract or contracts.
(c) During the 12 months prior to September 1954, the plaintiffs’ monthly volume of business had been as follows:
September 1953-$11,118.60
Oetober 1953_ 17, 880.54
November 1953. 19, 859. 07
December 1953-22,725. 00
January 1954— 22, 220. 00
February 1954_ 24, 568. 25
March 1954_ 26,988. 80
April 1954_ 28,250. 27
May 1954_ 29, 007.60
June 1954_ 24,277.54
July 1954_ 4,459.19
August 1954_ 4, 319. 21
The evidence does not show how much of the plaintiffs’ monthly volume of business during the period September 1953-August 1954 involved the production of garments for the United States.
7. When the plaintiffs learned on or about September 3, 1954 that contract No. DA-36-030-QM-4428 had been awarded to them, they immediately began to make preparations for the manufacture of the trousers called for by the contract. This involved purchasing an additional cutting table, some special attachments, and a supply of trimmings (thread, buttons, and packing supplies), and rearranging equipment in the plaintiffs’ plant. Also, the plaintiffs declined for a time to accept further orders from private concerns for the manufacture of civilian clothing, since the performance of contract No. DA-36-030-QM-4428 was expected to require the use of the plaintiffs’ entire equipment and personnel for a 3-month period. As a result of these actions by the plaintiffs, they were soon ready to begin the manufacture of trousers in accordance with contract No. DA-36-030-QM-4428, except for the cloth that was to be furnished by the Government (Bee finding 4).
8. (a) On September 17, 1954, the Deputy Chief of Staff for Logistics of the Army directed the Quartermaster General to recompute the requirements of the Army for certain *621 items, and also to “Examine all outstanding procurement now under contract and cut back tbat quantity not authorized for 'procurement under current directives which, can be eliminated without excessive termination costs. * * *”
(b) Pursuant to the instructions referred to in paragraph (a) of this finding, the Office of the Quartermaster General recomputed the requirements of the Army for men’s cotton trousers (among other items). As a result of such review, it was concluded that the Army would not need an additional supply of men’s cotton trousers within the reasonably near future. This conclusion was erroneous (see finding 15), but there is no evidence in the record indicating that it was motivated by bad faith or caprice, or that it was anything other than an honest mistake based upon incomplete data.
(c) Because of the conclusion reached by the Office of the Quartermaster General, as outlined in paragraph (b) of this finding, it was decided by such agency that procurement directive No. NY 1-0033-00-5-07 should be canceled, and that all contracts made pursuant to that directive should be terminated. Information concerning the cancellation of the procurement directive was transmitted to the Philadelphia Quartermaster Depot by the Office of the Quartermaster General on or about September 21,1954. On September 24,1954, the Office of the Quartermaster General informed the Philadelphia Quartermaster Depot that the contracts previously made pursuant to the procurement directive should be terminated by mutual consent at no cost to the Government, if possible, but that if such arrangements could not be made, the contracts were to be terminated for the convenience of the Government.
9o On September 24,1954, shortly after receiving from the Office of the Quartermaster General the instructions relative to the termination of the existing contracts for the procurement of men’s cotton trousers, personnel of the Philadelphia Quartermaster Depot communicated by telephone with all the persons holding such contracts, including the plaintiffs, and informed them that their respective contracts were being terminated for the convenience of the Government.
10. As of September 24, 1954, the first consignment of Government-owned cloth to be used by the plaintiffs in the *622 performance of contract No. DA-36-030-QM-4428 was en route to the plaintiffs’ plant. Personnel of the Philadelphia Quartermaster Depot caused such shipment to be diverted to another destination, so that it did not reach the plaintiffs’ plant. No Government-owned cloth was ever furnished to the plaintiffs for use in the performance of contract No. DA-36-030-QM-4428.
11. Formal notification relative to the termination of contract No. DA-36-030-QM-4428 was furnished to the plaintiffs by means of a telegram and a letter, both dated September 27, 1954, from the Philadelphia Quartermaster Depot. The telegram, which was signed “Mould,” stated (among other things) that “Your contract * * * is hereby terminated in its entirety pursuant to Article 38 * * * entitled ‘Termination for Convenience of the Government’ cma effective immediately,” and that a letter was to follow. The letter of the same date confirmed the telegram, and indicated (among other things) that the plaintiffs should promptly submit their settlement proposal.
12. Telegrams and letters similar to those mentioned in finding 11 were transmitted on September 27, 1954 by the Philadelphia Quartermaster Depot to the Big Ace Corporation, to Selma Garment Company, and to Nunnallv & McCrea Company, relative to the termination of their respective contracts for the production of men’s cotton trousers.
13. (a) After learning on September 24, 1954 that contract No. DA-36-030-QM-4428 was to be terminated, the plaintiffs promptly undertook to obtain orders for the manufacture of civilian garments. They obtained such orders to the extent that their volume of business amounted to $3,398.96 in September 1954, to $11,320.76 in October 1954, to $18,-861.77 in November 1954, and to $4,876.51 in December 1954. At the end of December 1954, the plaintiffs discontinued their manufacturing operations as a partnership trading under the name of Acme Sportswear Company.
(b) Although it is reasonable to infer that the plaintiffs’ volume of civilian business during the last 4 months of 1954 would have been greater than it actually was if they had not turned down some orders during the period September 3-24, 1954 while preparing to produce trousers for the Army under *623 contract No. DA-36-030-QM-4428 (see finding 7), the evidence does not show how ranch more civilian business the plaintiffs would have obtained if they had not entered into the Army contract.
14. (a) Under the date of November 29, 1954, the plaintiffs prepared and submitted to the Philadelphia Quartermaster Depot a settlement proposal, which called for the payment of $32,090.96 to the plaintiffs. This total was made up of the following items:
Trimmings_$2,503. 73
Additional cutting table- 650. 00
Freight_ 122.96
Special attachments_ 68.50
Maintaining personnel on standby basis- 3, 062.19
General and administrative expenses- 352.38
Anticipated profit_ 24,931.20
Settlement expenses_ 400.00
32,090.96
(b) The item in the amount of $24,931.20 referred to in paragraph (a) of this finding was computed on the basis of an anticipated net profit of 14 cents per unit times the quantity of trousers (178,080 pairs) which the plaintiffs had expected to manufacture under the contract.
15. (a) Following another review of the Army’s requirements for such garments, the Office of the Quartermaster General on February 21,1955 issued a new procurement directive (No. PL 1-0208-00-5-07) to the Philadelphia Quartermaster Depot for the procurement of 1,287,020 pairs of men’s cotton trousers of the same type as the 410,970 pairs involved in the plaintiffs’ contract No. DA-36-030-QM-4428 and the contracts mentioned in finding 3, all of which contracts had been terminated in September 1954. Pursuant to the new procurement directive, an invitation for bids (No. QM 36-030-55-693) was issued by the Philadelphia Quartermaster Depot on March 31, 1955. Contracts were subsequently entered into with clothing manufacturers for the procurement of approximately 1,200,000 pairs of men’s cotton trousers.[1] The unit prices paid by the Government under *624 such contracts were higher than the unit prices that had been provided for in the plaintiffs’ contract No. DA-36-030-QM-4428 and the contracts mentioned in finding 3, relating to trousers of the same type.
(b)The plaintiffs were afforded an opportunity to submit a bid pursuant to the invitation dated March 31, 1955, but did not do so.[2]
16. After an extensive audit of the plaintiffs’ records had been made by the Army, the contracting officer informed the plaintiffs in a letter dated April 6, 1955 that the Government was willing to allow the plaintiffs only $5,281.43 on their settlement proposal. The differences between the plaintiffs’ settlement proposal and the position of the contracting officer, as stated in his letter of April 6, 1955, related to the following items:
(a) The Army auditor had reported that one of the special attachments, listed by the plaintiffs as having cost $12.50, could not be located; and the contracting officer did not grant any allowance for the cost of this particular attachment.
(b) With respect to the plaintiffs’ claim for the cost of maintaining personnel on a standby basis, the Army auditor had reported that $1,991.19 of the amount claimed by the plaintiffs related to a period of time prior to the award of the contract to the plaintiffs; and, accordingly, the contracting officer proposed to allow the plaintiffs only $1,071 on this element of the plaintiffs’ claim.
(c) The contracting officer proposed to allow the plaintiffs as profit only $275.36, in lieu of the $24,931.20 claimed by the plaintiffs.
(d) The contracting officer proposed to allow the plaintiffs only $250 to cover their settlement expenses, whereas the plaintiffs had claimed $400 for such expenses.
17. The plaintiffs replied to the contracting officer’s letter of April 6, 1955 by means of a communication dated April 20, 1955. The plaintiffs stated (among other things) that “we are in complete agreement except for the allowance for *625 profit of $275.86,” and inquired whether it would be possible to “settle immediately for everything except the profit allowed and negotiate the profit allowance later.”
18. After further correspondence between the parties, the plaintiffs and the United States (acting through the successor contracting officer) entered into a supplemental agreement dated September 15, 1955. This agreement provided (among other things) as follows:
ARTICLE 3. Upon execution of this Agreement, the Government agrees to pay to the Contractor or its assignee * * * the sum of $4,993.57, arrived at by deducting from the sum of $5,281.43 * * * (2) the amount of $12.50 representing all applicable property disposal credits, and (3) the amount of $275.36 representing profit which will be disposed as hereinafter provided in Article 4. Said sum, together with all other sums heretofore paid, constitutes payment in full and complete settlement of the amount due the Contractor with respect to the terminated portion of the Contract, except as hereinafter provided in Article 4 * * * .
article 4. The question of allowable profit due the Contractor on the terminated portion of the contract will be considered by the Contracting Officer, apart from this agreement, and a separate determination made thereon. In the event contractor disagrees with any such determination of profit, it may invoke the provisions of paragraph (g) of Article 38 * * * .
19. In accordance with the agreement dated September 15,1955, the defendant subsequently paid to the plaintiffs the sum of $4,993.57.
20. The items of property involved in the settlement agreement of September 15, 1955 were made available by the plaintiffs to the defendant for disposition.
21. Findings of fact and a decision relative to the plaintiffs’ claim for anticipated profit were prepared by the successor contracting officer on September 19, 1955. The successor contracting officer decided “that the amount of $275.36 is a fair and equitable allowance for profit,” and stated that such amount “is hereby allowed in satisfaction of your claim.” The successor contracting officer informed the plaintiffs that an appeal might be taken from his findings and decision to the Secretary of the Army.
*626 22. An appeal was duly taken by the plaintiffs on October 8, 1955 from the findings and decision of the successor contracting officer mentioned in finding 21. In the notice of appeal, the plaintiffs stated (among other things) that “the amount of $4,993.57 has been agreed to by both parties as a settlement on this contract, except for a profit allowance”; and that “We are asking for a profit allowance of $.14 per unit or a total of $24,931.20 based upon an estimate [sic] profit which would have been realized had the contract not been terminated.”
23. While the plaintiffs’ appeal was pending before the Armed Services Board of Contract Appeals, the plaintiffs revised their claim by means of a letter which they addressed to the Board on February 2,1956. This letter stated in part as follows:
1. In the settlement proposal we originally asked for a sum of $24,931.20 based on an estimated profit. Upon reflection we see where our terminology and approach to the problem was wrong so that you could not understand our position. The claim we are now making is based upon two factors:
(A) An allowance for a salary for the two partners from Sept. 2,1954 (the date of award) to Sept. 27,1954 (the day the contract was terminated).
(B) Damages based upon contract work that could have been secured during the period of Sept. 2 to Sept. 27,1954.
A.
A fair salary for each partner would be $250 weekly. Since they worked on the government contract for a period of three weeks and four days, we are asking an allowance of $1,985.72 for the two partners as salary for this period.
B.
Since we are contractors producing for others we had to turn down various contracts offered us during the period from Sept. 2 to Sept. 27,1954 because the Government Contract would have taken all our facilities for the next three months. By Sept. 27, 1954, the date of termination, the “season” in contracting is over, each manufacturer has already made his agreement or contract with his contractor. We were therefore shut out from any major contract and had to accept odds and ends *627 for the balance of the season. We can secure letters from manufacturers to substantiate this claim. We estimate our damage from this at $9,000.00.
We are therefore making a claim for $10,985.72.
24. After a hearing, the Army Contract Appeals Panel of the Armed Services Board of Contract Appeals rendered a decision on the plaintiffs’ appeal. The decision was dated December 7,1956 and stated (among other things) as follows:
The record discloses no error in the decision of the contracting officer in allowing the sum of $2'75.36 as profit.
The claim for $9,000 as damages is dismissed; otherwise, the appeal is denied.
25. Subsequently, the present suit was filed by the plaintiffs on April 23,1957.

Findings Relative to Defendant's Oownterelaims

26. On April 20,1955, the Commissioner of Internal Revenue made assessments against the Acme Sportswear Company in the total amount of $10,209.72 for failure to account for and pay over withholding taxes, as required by Section 3402 of the Internal Revenue Code of 1954. These assessments covered the periods ending June 30, 1954, September 30, 1954, and December 31, 1954 (i.e., periods during which the plaintiffs, as partners, were trading as the Acme Sportswear Company). Subsequent to April 20, 1955, payments in the aggregate amount of $6,450 were made by the Acme Sportswear Company with respect to these obligations. The plaintiffs did not contest the correctness of the assessments referred to in this finding, and they do not dispute the correctness of such assessments in the present litigation.
27. On April 20,1955, the Commissioner of Internal Revenue made an assessment against the plaintiff Sol Cutler and two other persons, as partners, in the total amount of $430.17 for failure to pay taxes due under the Federal Unemployment Tax Act (Ch. 23, Internal Revenue Code of 1954). This assessment covered the year 1953. Subsequent to April 20, 1955, payments in the aggregate amount of $300 were made in order partially to discharge this obligation. Neither the plaintiff Sol Cutler nor the other persons against whom *628 this assessment was made contested the correctness of the assessment, and the plaintiff Sol Cutler does not dispute its correctness in the present litigation.
28. On December 23, 1957, the Commissioner of Internal Revenue made an assessment in the amount of $8,228.72 against the plaintiff Jerry Librach, as a principal officer of the Caroline Manufacturing Company, for failure to account for and pay over withholding taxes, as required by Section 8402 of the Internal Revenue Code of 1954. The assessment covered the periods ending December 31, 1956, March 31, 1957, and June 30, 1957. The plaintiff Jerry Librach did not contest the correctness of this assessment and does not dispute its correctness in the present litigation. No part of the $8,228.72 involved in this assessment has been paid.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein the court concludes as a matter of law that the plaintiffs are entitled to recover the sum of $275.36 and that the defendant is entitled to recover on its counterclaim against plaintiffs the sum of $3,759.72 with interest thereon as provided by law, and it is therefore adjudged and ordered after setting off one sum against the other that the United States recover of and from plaintiffs, jointly and severally, the sum of three thousand four hundred eighty-four dollars and thirty-six cents ($3,484.36), together with interest as provided by law on the sum of $3,759.72.
It is further concluded that the defendant is entitled to recover on its counterclaims against the plaintiffs individually, and it is therefore adjudged and ordered that the United States recover of and from Sol Cutler individually the sum of one hundred thirty dollars and seventeen cents ($130.17), together with interest thereon as provided by law, and that the United States recover of and from Jerry Librach individually the sum of eight thousand two hundred twenty-eight dollars and seventy-two cents ($8,228.72), together with interest thereon as provided by law.

 Approximately half of these contracts, In terms of volume, were made upon the basis of bids submitted In response to the Invitation, and the remainder were negotiated with small business concerns.

 The plaintiffs were ineligible for consideration in connection with the negotiated contracts because they did not malee any attempt to obtain a contract pursuant to the invitation for bids.