## CUSTOM PRINTING COMPANY

v.

## UNITED STATES.

No. 99–265C.

United States Court of Federal Claims.

Filed: Feb. 15, 2002.

Reissued for Publication: March 4, 2002 *.

Raymond Fioravanti, Washington, DC, for the plaintiffs. Shlomo D. Katz, of counsel.

---

* On February 15, 2002, this Opinion was issued under a Protective Order. On March 4, 2002, the Court issue an Order directing that the Opinion, in its entirety, was to be removed from the Protective Order and was to be released for publication.

Opher Shweiki, Washington, DC, with whom was Acting Assistant Attorney General Stuart E. Schiffer for the defendant. Roy E. Potter, Government Printing Office, of counsel.

## OPINION

YOCK, Senior Judge.

On April 30, 1999, the plaintiff, Custom Printing Company ("Custom Printing"), filed a Complaint against the United States (the "defendant"), alleging breach of contract and promissory estoppel. On September 15, 1999, Custom Printing voluntarily dismissed its promissory estoppel claim, Count II of the Complaint. This matter is now before this Court on the parties' cross-motions for summary judgment. For the reasons set forth herein, the defendant's Motion for Summary Judgment is GRANTED, and the plaintiff's Motion for Summary Judgment is DENIED.

### Background

In early 1998, the Government Printing Office ("GPO") sent out an invitation for bids ("IFB") for Program C271–S, which involved the procurement of the U.S. Terminal Procedures Publication (twenty loose-leaf and twenty perfect-bound volumes), Alaska Terminal Procedures Publication (one bound volume), and changes therein, as requisitioned by the National Oceanic and Atmospheric Administration ("NOAA").[1] The Program C271–S IFB was sent to thirty-seven contractors; in reply, the GPO received ten no bids and two responsive bids, made by Custom Printing and Fry Communications, Inc. ("Fry Communications"), respectively.

Section 3 ("Determination of Award") of the Program C271–S IFB provided that "[t]he Government will determine the lowest bid by applying the prices offered in the 'Schedule of Prices' to the following units of production which are the estimated requirements to produce [one year's production] under this contract." Def.'s Mot. for Summ. J.App. at 5, 39. Using the estimated units of production listed in the Determination of Awards, the total gross contract bid prices for Custom Printing and Fry Communications were $2,472,216.88 and $2,591,251.76, respectively. Thus, under the terms of the original Determination of Awards contained in the Program C271–S IFB, Custom Printing offered the lowest bid by a difference of $119,034.88. On June 10, 1998, in accordance with the contracting officer's recommendation, the GPO awarded the contract for Program C271–S (the "Contract") to Custom Printing. The term of the Contract was "for the period beginning Date of Award and ending February 28, 2003." Id. App. at 6.

The Program C271–S IFB, however, contained a serious underestimate of the number of strip-ins to be required annually under the Contract. A "strip-in" is a line on a page that identifies the volume number, page number, and effective date of the page. While nearly every page of the U.S. Terminal Procedures publication and the Alaska Terminal Procedures publication required a strip-in, the Program C271–S IFB contained the erroneous estimate that only 108 strip-ins would be needed per year.[2] In reality, the number of strip-ins required was approximately 65,000 per year.[3] Based on Custom Printing's original bid price of $12 per strip-in, its total estimated price for strip-ins was $1,296 per year. Using the corrected number of strip-ins, Custom Printing's revised bid price for strip-ins would amount to approximately $780,000 per year. In contrast, Fry Communications had offered an original bid price of $0.20 per strip-in, with a total estimated

---

1. Because these publications were to be used during the takeoff and landing of airplane flights, contractors would be required to adhere strictly to product specifications and rigid schedules in preparing these publications.

2. The defendant asserts that this error occurred because the previous contractor, Fry Communications, did not charge for strip-ins during the previous contract period. See Def.'s Mot. for Summ. J.App. at 56.

3. This estimate is achieved by taking the number of strip-ins required for Custom Printing's first printing production cycle (9,756), rounded up to the nearest thousand (10,000) and multiplying it by the number of production cycles per year (6.5). Both parties agree that this is an accurate estimate of the number of strip-ins actually required under the Contract. See Def.'s Proposed Findings of Uncontroverted Facts ¶ 11; Pl.'s Statement of Genuine Issues ¶ 11. See also Def.'s Mot. for Summ. J.App. at 56.

price for strip-ins of $21.60 per year. Using the corrected number of strip-ins, Fry Communications' revised bid price for strip-ins would be approximately $13,000 per year. Assuming that all else was equal, a change in the annual number of strip-ins required under the Contract would have increased Custom Printing's estimated total bid price to $3,250,920.88 per year; while Fry Communications' estimated total bid price would have increased to only $2,604,230.16 per year. Thus, under the corrected requirements of the Program C271–S IFB, Fry Communications might have been awarded the Contract as the contractor with the lowest bid.[4]

In approximately December 1998, the GPO's contracting officer, Mr. Jack Scott, informed Custom Printing that its invoiced charge for strip-ins was too high and requested that Custom Printing lower its price for that line item. The GPO and Custom Printing, however, were unable to reach an agreement as to a revised price for strip-ins. *See* Def.'s Mot. for Summ. J.App. at 48–50 (Deposition of John R. Scott, Contracting Officer). *See also* Def.'s Opp'n to Pl.'s Mot. for Summ. J. & Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J.App. at 1–2 (Deposition of Ronal Cooper, Director of Marketing, Custom Printing).

Section A of the Contract, entitled "General Terms and Conditions," explicitly provided that the Contract was subject to "the applicable provisions, clauses, and supplemental specifications of GPO Contract Terms (GPO Pub. 310.2, effective December 1, 1987 (Rev.9–88)) * * *." Def.'s Mot. for Summ. J.App. at 7. Section 19 of the GPO Contract Terms (GPO Pub. 310.2), entitled "Termi-

nation for the Convenience of the Government," allows the GPO to terminate a contract for the convenience of the Government. Section 19 states, in pertinent part:

> The Government may terminate performance of work in whole or in part if the Contracting Officer determines that a termination is in the Government's interest.

GPO Contract Terms § 19(a) (GPO Pub. 310.2) (Dec.1987 (Rev.9–88)).

On February 1, 1999, the contracting officer submitted a memorandum to the GPO Contract Review Board requesting "[c]oncurrence * * * to terminate the contract for the convenience of the Government and readvertise with revised specifications." Def.'s Mot. for Summ. J.App. at 56. The contracting officer provided the following basis for his request to terminate the Contract:

> The Determination of Award figure for strip-ins (line item I.(e)) was incorrectly figured at 108, when actually the figure should have been figured at 65,000. The previous contractor, Fry Communications, Inc., did not charge for this line item during the previous contract periods, therefore, the Agency did not take the number of strip-ins into consideration when determining the basis of award figure for this line item. Custom Printings' cost for strip-in is $12.00 per strip-in which works out to approximately $120,000.00 per printing/binding order or $780,000.00 per contract period, for this strip-in charge. After the error was discovered, the Government was unsuccessful in attempting to negotiate a fair and reasonable price for strip-ins with Custom Printing Co. NOTE: Fry Communications, Inc. bid price for this line

---

4. The plaintiff objects to these calculations on the ground that a contractor's high or low bid for strip-ins may represent a commensurate increase or decrease in other line items under the contract. Pl.'s Statement of Genuine Issues ¶ 12. Nevertheless, Custom Printing does not dispute that there was a significant increase in the number of strip-ins actually required under the Contract, that it billed the GPO $12 per strip-in for the first printing production cycle, or that Custom Printing's total price for strip-ins increased to approximately $780,000 per year. *Id.* ¶ 12. Given such admissions, this Court cannot ignore that, as a matter of simple mathematics, Custom Printing's estimated total bid price would have been at least $3,250,920 per year. The effect of

the error on Fry Communications' bid, however, is a bit more ambiguous at this stage, because it is unclear to what extent, if any, an increase in the number of strip-ins would have had on Fry Communications' other line items. Neither the plaintiff nor the defendant has produced any evidence regarding how Fry Communications bid might have been affected by the changed figures. Nevertheless, even assuming that Fry Communications' corrected total bid would have been more than $2,604,230, an error in the number of strip-ins in the original IFB resulted in significant uncertainty as to the actual pricing of the bids that may or may not have resulted in Fry Communications having the lowest bid.

item was $.20 per strip-in. In addition, the Department of Commerce (NOAA), wants to add an additional color to the charts, which is not covered in the current specifications.

If the correct line item figure for strip-ins was used in the determination of award, Custom Printing Co. would not have been the low bidder on program C271–S. The Department of Commerce (NOAA) did not allocate the additional funds for the unexpected increase in costs, nor do they have the appropriate funds to continue this contract at current contract prices.

*Id.*

On February 1, 1999, the GPO Contract Review Board concurred in the contracting officer's recommendation that the Contract should be terminated for the convenience of the Government. Accordingly, on February 2, 1999, the contracting officer served upon Custom Printing a notice of termination for the convenience of the Government. This notice explicitly stated that the Contract was "terminated for the convenience of the Government, in accordance with the Article entitled 'Termination for Convenience of the Government' in GPO Contract Terms (Pub. 310.2)." Def.'s Mot. for Summ. J.App. at 57. The termination was to be effective as of March 31, 1999.

In the meantime, in January 1999, the GPO had issued an IFB for Program C871–S. Similar to the IFB for the C271–S Program, the IFB for the C871–S Program was for the procurement of the U.S. Terminal Procedures Publication, Alaska Terminal Procedures Publication, and changes therein, as requisitioned by the NOAA. Indeed, Program C871–S was described in the new IFB as being "[f]ormerly C271–S." *See* Def.'s Mot. for Summ. J.App. at 80. The two IFBs, however, were not wholly identical. The Program C871–S IFB did not contain a spe-

cific line item for strip-ins and required the use of an additional color for a portion of the publications. Further, while the Program C271–S IFB had resulted in the award of a basic five-year contract, the Program C871–S IFB was to result in the award of a one-year contract with up to four optional twelve-month extension periods. Despite these minor differences, Program C871–S was clearly intended to replace Program C271–S.

The Program C871–S IFB also initially contained a geographical restriction that would have excluded Custom Printing from the bidding process.[5] According to the defendant, this restriction was inserted in order to accommodate for NOAA's lack of funds to travel for press sheet, bindery, and distribution expenses. *See* Def.'s Statement of Genuine Issues ¶ 9. Upon protest by Custom Printing, this restriction was revised to fully enable Custom Printing to submit a bid.[6] Despite this revision, Custom Printing failed to offer a bid on the Program C871–S IFB.

The Program C871–S IFB was sent to twenty-three contractors and resulted in four no bids and two responsive bids. Fry Communications and a joint venture from Baltimore, Maryland, submitted the two responsive bids. The GPO subsequently awarded the contract for Program C871–S to Fry Communications as the responsive bidder with the lowest bid price.

On February 23, 1999, Custom Printing submitted a formal claim to the contracting officer alleging that the GPO's termination of the contract was improper and constituted a breach of contract. The contracting officer issued a final decision denying Custom Printing's claim on March 16, 1999. The officer claimed that the Contract had been

> terminated for the convenience of the Government effective March 31, 1999, in accordance with applicable contract terms. This action was taken after the Government's discovery of an error in the Deter-

---

5. This restriction provided that "[a]ll production facilities (including subcontractors) used in the manufacture of the product(s) ordered under this contract must be located within a 201–kilometer (125–mile) radius of zero milestone, Washington, DC." *See* Def.'s Mot. for Summ. J.App. at 80.

6. The revised restriction stated that "[a]ll presswork, bindery, and distribution facilities used in the manufacture of the product(s) ordered under this contract must be located within a 201–kilometer (125–mile) radius of zero milestone, Washington, DC." *See* Def.'s Mot. for Summ. J.App. at 64.

mination of Award in the line item figure for strip-ins. This error increased the contract award price $780,000 per year, an increase of $3,900,000 for the contract term. Funds were not allocated to cover this unexpected increase in cost. After the error was discovered, the Government was unsuccessful in attempting to negotiate a fair and reasonable price for strip-ins with [Custom Printing].

Def.'s Mot. for Summ. J.App. at 129.

On April 30, 1999, Custom Printing timely filed a two-count Complaint with this Court, alleging breach of contract and promissory estoppel. Custom Printing sought $2,400,000 in allegedly lost anticipated profit upon the grounds that the GPO had improperly terminated the Contract for convenience of the Government. On August 13, 1999, the defendant filed a motion to dismiss Count II of the Complaint for lack of subject matter jurisdiction, and, in response to that motion, Custom Printing voluntarily dismissed its promissory estoppel claim.

### Discussion

Under the Rules of the United States Court of Federal Claims ("RCFC"), this Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). *See also Pacificorp Capital, Inc. v. United States*, 25 Cl.Ct. 707, 713, *reh'g denied*, 26 Cl.Ct. 428 (1992), *aff'd*, 988 F.2d 130 (Fed. Cir.1993) (Table) (allowing summary judg-

ment against contractor alleging breach of contract based upon termination for convenience); *Embrey v. United States*, 17 Cl.Ct. 617, 624 (1989) (same). If both parties have cross-moved for summary judgment, such as in the present case, each party's motion must be evaluated on its own merits, drawing all reasonable presumptions and inferences against the party whose motion is being considered. *See Mingus Constructors*, 812 F.2d at 1391. If the moving party has met its burden of showing that it is entitled to judgment as a matter of law, the burden then shifts to the nonmoving party to provide facts establishing that a genuine issue for trial exists, again drawing all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The contract at issue in this case incorporates by reference Section 19 ("Termination for the Convenience of the Government") of the GPO Contract Terms.[7] This section explicitly provides the GPO with the right to terminate a contract for the convenience of the Government.[8] Section 19 states, in pertinent part, that

[t]he Government may terminate performance of work in whole or in part if the Contracting Officer determines that a termination is in the Government's interest. The Contracting Officer shall terminate by delivering to the contractor a Notice of Termination specifying the extent of termination and the effective date.

GPO Contract Terms § 19(a) (GPO Pub. 310.2) (Dec.1987 (Rev.9–88)).

▮ This Court employs a highly deferential standard when reviewing the Government's decision to terminate for convenience. *See John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 390, 325 F.2d 438, 442 (1963). While the Government's right to terminate a

---

7. Section A of the Contract stated that the agreement was subject to "the applicable provisions, clauses, and supplemental specifications of GPO Contract Terms (GPO Pub. 310.2, effective December 1, 1987 (Rev.9–88)) * * *." Def.'s Mot. for Summ. J.App. at 7.

8. Because the GPO is part of the legislative branch of the United States Government, the

Federal Acquisition Regulations ("FAR") are inapplicable to the Contract. Nevertheless, the "Termination for the Convenience of the Government" clause contained in the GPO Contract Terms is nearly identical to the FAR's termination for convenience provisions. *See, e.g.*, 48 C.F.R. § 52.249–6 (2001).

contract for convenience is not unlimited, the case law clearly provides that the Government is entitled to considerable latitude in making such a decision to terminate. *See, e.g., T & M Distrib., Inc. v. United States,* 185 F.3d 1279 (Fed.Cir.1999); *Krygoski Constr. Co. v. United States,* 94 F.3d 1537 (Fed.Cir.1996), *cert. denied,* 520 U.S. 1210, 117 S.Ct. 1691, 137 L.Ed.2d 819 (1997). Only evidence that the contracting officer acted in bad faith or engaged in a clear abuse of discretion will be sufficient to merit summary judgment for the contractor. *Salsbury Indus. v. United States,* 905 F.2d 1518, 1521 (Fed.Cir.1990), *cert. denied,* 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 664 (1991). *See also Caldwell & Santmyer, Inc. v. Glickman,* 55 F.3d 1578, 1581 (Fed.Cir.1995); *John Reiner & Co.,* 163 Ct.Cl. at 390, 325 F.2d at 442.

Moreover, this Court must presume that the Government acted in good faith in contracting, and this presumption may be overcome only by "well-nigh irrefragable proof" that the Government acted in bad faith. *Torncello v. United States,* 231 Ct.Cl. 20, 45, 681 F.2d 756, 770 (1982) (quoting *Knotts v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954)). *See also Kalvar v. United States,* 211 Ct.Cl. 192, 198, 543 F.2d 1298, 1301 (1976) ("Any analysis of a question of Governmental bad faith must begin with the presumption that public officials 'act conscientiously in the discharge of their duties'") (quoting *Librach v. United States,* 147 Ct.Cl. 605, 612 (1959)); *Krygoski,* 94 F.3d at 1541 ("The contractor's burden to prove the Government acted in bad faith, however, is very weighty."). The plaintiff must provide this Court with evidence of a specific intent to harm the plaintiff in order to support its claim of bad faith. *Torncello,* 231 Ct.Cl. at 45, 681 F.2d at 770. As a result of this substantial burden, "contractors have rarely succeeded in demonstrating the Government's bad faith." *Krygoski,* 94 F.3d at 1541.

■ Despite the weight of the case law, Custom Printing has argued for a stricter review of the Government's termination for convenience. Citing *Torncello v. United States,* 681 F.2d 756, 231 Ct.Cl. 20 (1982), the plaintiff asserts that "[i]t is well established that termination for convenience is available as a remedy only in situations where the circumstances of the bargain or the expectations of the parties have changed." Pl.'s Mot. for Summ. J. & Opp'n to Def.'s Mot. for Summ. J. at 3. Such an assertion, however, is contrary to the settled law. The "changed circumstances" test to which the plaintiff alludes, set out by the plurality in *Torncello,* has been explicitly rejected by the United States Court of Appeals for the Federal Circuit ("Federal Circuit") in subsequent cases. *See T & M Distrib.,* 185 F.3d at 1284 n. 4; *Krygoski,* 94 F.3d at 1543–45. Indeed, the Federal Circuit has stated that *Torncello* merely "stands for the unremarkable proposition that when the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause." *Salsbury Indus.,* 905 F.2d at 1521. There is no requirement that the Government show "changed circumstances" (or even a "cardinal change" of some sort) in order to justify termination for convenience. *T & M Distrib.,* 185 F.3d at 1284.

■ In the present case, the GPO justified its termination for convenience on the grounds that the Determination of Awards significantly underestimated the actual requirements of the Contract. As a result of this underestimate, the GPO asserts that the resulting Contract was prohibitively expensive and that the integrity of the competitive bidding was adversely affected. Specifically, the contracting officer determined that:

> The Determination of Award figure for strip-ins (line item I.(e)) was incorrectly figured at 108, when actually the figure should have been figured at 65,000. * * * Custom Printings' cost for strip-in is $12.00 per strip-in which works out to approximately $120,000.00 per printing/binding order or $780,000.00 per contract period, for this strip-in charge. * * *
>
> If the correct line item figure for strip-ins was used in the determination of award, Custom Printing Co. would not have been the low bidder on program C271–S. The Department of Commerce (NOAA) did not allocate the additional

funds for the unexpected increase in costs, nor do they have the appropriate funds to continue this contract at current contract prices.

Def.'s Motion for Summ. J.App. at 56.

The Federal Circuit and this Court frequently have upheld terminations for convenience under similar circumstances, in which irregularities in the original solicitation had an impact upon competitiveness of the bidding process. For example, in *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578 (Fed.Cir.1995), the Federal Circuit upheld a contracting officer's decision to terminate a contract for convenience based on a mere ambiguity within the bid solicitation. This ambiguity increased the actual cost of the contract by between $200,000 to $300,000, and led the contracting officer to conclude that "the ambiguity of the specifications impeded full and open competition." *Id.* at 1580. More specifically, the contracting officer determined that "the modification that would have been necessary to reflect [the agency's] original intent would have been too costly and would have been unfair to the other bidders." *Id.* at 1581. The Federal Circuit stated that "[t]he stipulated facts simply do not support [the plaintiff's] claim that the contracting officer acted in bad faith or abused his discretion." *Id.*

Similarly, in *Krygoski Construction Co. v. United States*, 94 F.3d 1537 (Fed.Cir.1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1691, 137 L.Ed.2d 819 (1997), the Federal Circuit determined that the contracting officer had not acted in bad faith when he terminated a contract for the convenience of the Government based upon the discovery that the contract that the Government had entered into would cost more than expected because of a misestimate in the original IFB. In *Krygoski*, the Government had entered into a contract for the demolition of an airfield and missile site, including the removal and disposal of all asbestos found at the site. *Id.* at 1538–39. While the IFB had estimated that the site contained limited asbestos only around pipes, tanks, and ducts, a pre-demolition survey by the plaintiff had discovered additional asbestos in the flooring and roof insulation. *Id.* As a result, the costs of the asbestos removal increased from about 10 percent of the contract's costs ($40,000 out of an estimated $415,000 contract) to approximately 50 percent of the contract's costs ($360,000 out of an estimated $775,000 contract). *Id.* at 1544. Thus, the Federal Circuit held that the contracting officer's

> decision to terminate is analogous to that made in *Caldwell*. [The contracting officer] terminated the contract to preserve full and open competition. He decided to avoid any prospect of prejudice to other bidders. Unlike the *Torncello* situation, this record shows no evidence that the Corps intended from the outset to void its promises. Thus, *Torncello* does not apply. Accordingly, this court finds that [the contracting officer] did not abuse his discretion, act arbitrarily or capriciously or in bad faith in terminating the contract for the Government's convenience.

*Id.* at 1545.

Most recently, in *T & M Distributors, Inc. v. United States*, 185 F.3d 1279 (Fed.Cir. 1999), the Federal Circuit allowed a contracting officer to terminate for convenience, and to issue a second solicitation, based upon the discovery of an error in the original solicitation that increased the price of the contract and likely had an impact upon the integrity of the procurement process. In that case, the estimated scope of a Navy requirements contract for automobile parts and accessories was substantially increased so that the value of the contract increased by 450 percent. *Id.* at 1280–81. In light of this error, the Federal Circuit held that the contracting officer was well within his discretion in resoliciting the contract. *Id.* at 1284.

The contracting officer's reasoning in the present case is consistent with the above cases. The contracting officer had ample justification to terminate the Contract for the convenience of the Government, and the stipulated facts support the contracting officer's decision. As the contracting officer asserted, the original IFB contained a serious underestimate of the number of strip-ins required under the Contract, and such an underestimate affected the original bid estimates to such an extent that it is unclear whether or not Custom Printing would have been the

low bidder for Program C271–S. The erroneous estimate found in the original IFB increased the cost of the Contract by approximately $778,704 per year, or $3,893,520 over the life of the Contract. While strip-ins represented only about .05 percent of the cost of the Contract under the original estimate, under the corrected figures, strip-ins represented approximately 24 percent of the cost of the Contract. This inaccurate estimate had a direct impact upon the competitiveness of the bidding process. If the number of strip-ins is corrected, all else being equal, Custom Printing would not have been the low bidder for Program C271–S. Even if the other bidders would have increased the cost of other line items as a result of the enlarged number of strip-ins actually required by the Program C271–S, the seriously erroneous underestimate of the number of strip-ins introduced substantial uncertainty into the bidding process such that the contracting officer was reasonable in terminating for convenience.

Although the plaintiff has alleged bad faith in this action, the plaintiff's purported evidence of bad faith is unconvincing. First, the plaintiff points to statements made by an official at NOAA that the agency did not wish to renew Custom Printing's contract after the first year. These statements, however, were made in the mistaken belief that Custom Printing had an option contract, rather than a five-year contract, in reaction to numerous alleged technical errors made by Custom Printing. Although these statements express a dissatisfaction with the quality of Custom Printing's work and a misunderstanding of the nature of the Contract, they clearly do not rise to the level of bad faith. In any event, such statements were made by an official at NOAA, not the contracting officer.

Second, the plaintiff claims that the geographical restriction initially contained in the Program C871–S IFB was designed to exclude Custom Printing, offering evidence of bad faith. This geographical restriction, however, was revised upon protest by Custom Printing to allow Custom Printing to participate fully in bidding for the Program C871–S IFB. Custom Printing chose not to participate. Moreover, the evidence makes clear that this restriction was separate and distinct from any desire that NOAA officials had to avoid dealing with Custom Printing. The geographical restriction was merely intended to accommodate for NOAA's lack of funds to travel for press sheet, bindery, and distribution expenses.

The plaintiff here has successfully demonstrated that an official at NOAA was dissatisfied with Custom Printing's performance and wished to avoid business with Custom Printing in future matters. However, this official had no authority to decide whether or not the GPO awarded its bids to Custom Printing and had no authority to decide whether or not to terminate for convenience. Rather, the contracting officer determined to terminate for convenience for legitimate reasons that were unrelated to the NOAA official's concerns about the plaintiff's performance.

In summary, this Court can find no evidence of bad faith under the facts presented here. The contracting officer decided to terminate the Contract for convenience based upon the discovery of an error in the original solicitation that significantly increased the price of the Contract and likely had an impact upon the integrity of the procurement process. The Government was acting within its contractual rights to have done so.

## CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for Summary Judgment is DENIED, the defendant's Motion for Summary Judgment is GRANTED, and the plaintiff's Complaint is to be dismissed.

Each party is to bear its own costs.