**T & M DISTRIBUTORS, INC.,**
Plaintiff–Appellant,

v.

**UNITED STATES, Defendant–Appellee.**

No. 98–5106.

United States Court of Appeals,
Federal Circuit.

July 26, 1999.

Joseph J. Petrillo, Petrillo & Powell, P.L.L.C., Washington, DC, argued for plaintiff-appellant. With him on the brief was William E. Conner.

John Warshawsky, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellee. With him on the brief were David M. Cohen, Director and Sharon Y. Eubanks, Deputy Director.

Before PLAGER, Circuit Judge, SMITH, Senior Circuit Judge, and SCHALL, Circuit Judge.

SCHALL, Circuit Judge.

T & M Distributors, Inc. (T & M) appeals from the final judgment of the United States Court of Federal Claims dismiss-

ing its claim against the United States for breach of a requirements contract. *T & M Distrib. v. United States,* No. 97–148C, 1998 WL 118077 (Fed.Cl. Mar. 17, 1998).

Shortly after award, the Navy terminated its contract with T & M for the convenience of the government. In due course, T & M submitted a termination settlement proposal and a breach of contract claim alleging wrongful termination. The parties reached settlement on termination costs to which T & M was entitled, but the contracting officer denied the breach of contract claim. T & M appealed the denial to the Court of Federal Claims, which granted the government's motion for summary judgment after concluding that the contracting officer had not acted improperly in invoking the contract's termination for convenience clause. We affirm.

## BACKGROUND

### I

On October 19, 1995, the Navy awarded Contract No. N00406–96–D–4026 to T & M. Under the contract, T & M was to provide the Navy with automotive and related vehicle parts and accessories to support the United States Public Works Center on the island of Guam. The contract was awarded pursuant to a competitive procurement bid solicitation. The solicitation sought bids for the operation and maintenance of a Contractor Operated Parts Store ("COPARS") on Guam for one base year and four one-year option periods. The Navy's annual requirements were estimated in a list of anticipated expenditures that was appended to the solicitation. An amendment to the solicitation included a list of questions and answers, among which was the following:

Q10. What amount, if any, of government owned parts are currently on hand? Is there a listing available? What category are those parts under?

Answer: The amount of government owned parts on hand changes rapidly from day to day. The contractor shall assume that the Government does not

have a supply of parts on hand to supplement contractor inventory.

T & M was awarded the contract, with performance to begin on December 1, 1995. The value of the contract for all five years was estimated at $1,130,000. The contract contained the standard clause found at 48 C.F.R. § 52.249–2, allowing for termination of the contract for the convenience of the government.

After experiencing difficulties in compiling a comprehensive parts inventory list, T & M's president, Thomas W. Daly, visited Guam in early November 1995. Upon his return from Guam, Mr. Daly wrote the contracting officer that he had discovered circumstances that suggested a diminished value of the contract and possible obstacles to contract performance:

[I]t was revealed to us that the Public Works Facility at Guam had an existing "base store" which provided them with replacement parts for their vehicles. This was troubling for two reasons; the contract clearly calls for the establishment of a COPARS to supply the [Department of Public Works (DPW) ] with repair parts and this also affects our ability to put together a workable inventory if the DPW "base store" already stocks some parts.

\* \* \* \* \* \*

I discovered the following: the base store maintains an inventory of approximately $700,000.00 with a total number of 4000 line items. This is a long way from no inventory as had been stated. I was also informed that the DPW was required to go to the base store as their first source of supply, to [Fleet and Industrial Supply Center] next and then to the contractor. I also learned unofficially that the DPW also had [Basic Purchase Agreements] with local parts distributors. As you can imagine this all plays a part in how we structure our inventory and our ability to do business with DPW.

Although Mr. Daly assured the contracting officer that T & M was ready, willing, and able to be operational by December 1, 1995, he requested that the date for the commencement of contract performance be postponed to January 2, 1996.

On November 28, 1995, the contracting officer instructed T & M to suspend preparations. The next day, Mr. Daly sent a letter to the contracting officer in which he proposed contract modifications to "resolve the problems [in] making the COPARS store operational." In December, a government attorney visited Guam to investigate Mr. Daly's concerns and to obtain relevant information. The contracting officer later recounted what the investigation revealed:

a. The government did have an existing inventory in the approximate amount of $700,000 and had Basic Purchase Agreement's (BPA's) with local firms. This information had not been disclosed to the Contracting Officer and this office during the solicitation process.

b. The estimated amount in the contract was grossly understated. A review of the historical usage indicated the estimated amount for the base period and option periods should have been $4,455,911 rather than the [$]595,250 as awarded by the contract.

c. There were conflicting opinions among Navy managers at the [Public Works Center], Guam as to the type of contract desired. Ultimately, however, the decision was made to utilize an indefinite requirements type of contract with performance to begin April 1, 1996.

In a letter dated December 21, 1995, the contracting officer terminated the contract for the convenience of the government. On January 17, 1996, the Navy issued a second solicitation, which took into account the existence of a temporary base store and the increased estimated value of the contract. The solicitation estimated the contract value at $5,048,590, a 450 percent increase over the estimate in the first so-

licitation. T & M and one other contractor submitted bids. The contract was awarded to the other contractor, who had not bid on the first solicitation.

## II

On September 3, 1996, T & M submitted to the contracting officer a certified claim for breach of contract, seeking damages in the form of anticipated profits in the amount of $1,325,000.[1] In a decision dated January 3, 1997, the contracting officer denied the claim, based on his determination that the termination of the contract was neither arbitrary nor capricious, and that T & M would be reimbursed for its costs through a termination settlement.

The contracting officer stated that mission needs could not have been met under the original contract because the Navy's estimated usage and the scope of the work had been substantially underestimated, and he pointed out differences in the requirements set forth in the original contract and the second contract. The contracting officer stated that it had been his opinion that "a cardinal change in government requirements had occurred and that the competitive environment would best be served by terminating [the] contract for the convenience of the government and resoliciting the new requirement under conditions of full and open competition." He continued that the decision to re-compete had been logical because T & M had not started to perform under the contract and that therefore any costs incurred by it were minimal. The contracting officer suggested that, if circumstances had been reversed, "i.e. that the government estimate for all five years under [the] contract had decreased from $5.0 million to $1.1 million just after award," T & M would have been justified in seeking termination. The contracting officer concluded his decision by stating that he had terminated T & M's contract after determining that the changes required in the contract to bring

---

1. That same day, T & M also submitted its termination settlement proposal. As noted above, the parties reached agreement on T & M's settlement costs.

it into line with the Navy's needs "were out of scope and so profound that they could not be incorporated into [the] contract."

## III

Eventually, T & M filed a complaint in the Court of Federal Claims appealing the contracting officer's decision denying the claim for breach of contract. The government moved for summary judgment, which T & M opposed on the merits and on the grounds that genuine issues of material fact existed that could only be resolved by an evidentiary hearing after appropriate discovery.

In its decision granting summary judgment in favor of the government, the Court of Federal Claims began by noting that "[i]n the absence of bad faith or a clear abuse of discretion, the contracting officer's decision to terminate a contract for the convenience of the government is conclusive." *T & M Distrib.*, 1998 WL 118077, at *3 (quoting *Krygoski Const. Co. v. United States*, 94 F.3d 1537, 1543 (Fed. Cir.1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1691, 137 L.Ed.2d 819 (1997)). The court also noted that "[i]t must be presumed that the contracting officer acted in good faith in effecting the termination."

Addressing the merits, the court concluded that the substantial increase in the Navy's estimated requirements constituted a cardinal change to the contract. The court reasoned that the increased estimates could attract a different pool of bidders, thereby making it necessary for the Navy to re-solicit the contract under conditions of full and open competition pursuant to the Competition in Contracting Act (CICA), Pub.L. No. 98–369, 98 Stat. 1175 (codified as amended in scattered sections of U.S.C.).[2] Based on its conclusion that a cardinal change had occurred, the court determined that the contracting officer had not abused his discretion in terminating the contract for the

government's convenience. It therefore granted the government's motion for summary judgment and dismissed the complaint.

T & M appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### I

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* RCFC 56(c). We review a grant of summary judgment *de novo. See Dana Corp. v. United States*, 174 F.3d 1344, 1347 (Fed.Cir.1999).

### II

T & M's contract with the Navy incorporated by reference the standard termination for convenience clause, which provides in pertinent part as follows:

> The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest. The Contracting Officer shall terminate by delivering to the Contractor a Notice of Termination specifying the extent of the termination and the effective date.

48 C.F.R. 52.249–2 (1984). *See also T & M Distrib.*, 1998 WL 118077, at *3. T & M's principal argument on appeal starts from the premise that only a "cardinal change" can support a termination for convenience. Asserting that this is the teaching of *Krygoski*, T & M states that the Court of Federal Claims recognized the cardinal change standard, but erred in its application. According to T & M, the trial

---

**2.** Among other things, CICA provides that "an executive agency in conducting a procurement for property or services ... shall obtain

full and open competition through the use of competitive procedures." *See* 41 U.S.C. § 253(a)(1).

court erred in concluding that the increase in the Navy's estimated requirements constituted a cardinal change.

The estimates, T & M contends, did not form part of the contractual obligation because a requirements contract such as the one at issue ordinarily obligates the contractor to satisfy all of the government's requirements, regardless of any previous estimate. T & M cites government regulations for the proposition that estimates are non-binding and do not define the government's requirements. It also quotes the following passage from its contract:

NOTICE TO OFFERORS:

In accordance with FAR 52.216–21, *REQUIREMENTS*, the expenditures listed above are estimates only and are in no way purchased or guaranteed under this contract.

T & M maintains in addition that the government's requirements did not actually change from the first solicitation to the second solicitation. Specifically, T & M points out that both solicitations were for requirements contracts relating to automotive and related vehicle parts to support the vehicle fleet on Guam. Because there was no material change in the vehicle fleet listings, T & M reasons, there could have been no material change in the purchases that would have been required under the contract. Based on its argument that no change in the estimates could have effected a material change in the government's actual requirements, T & M argues that the Court of Federal Claims erred in holding that a cardinal change had occurred.

T & M further contends that an affidavit by Mr. Daly that was submitted as part of T & M's opposition to the government's motion for summary judgment established that a change in estimates would not have affected the pool of bidders. Mr. Daly stated in his affidavit that, in bidding on a government contract, he typically does not rely upon the estimates in the solicitation because he knows them to be "extremely inaccurate."

T & M analogizes the present case to *Master Security, Inc.*, B–274990, B–274990.2, Jan. 14, 1997, 97–1 CPD ¶ 21, in which the Comptroller General denied a bid protest seeking re-solicitation of a requirements contract in the face of a substantial change in the estimated value of the proposed contract. The change in that case was an increase in the number of estimated hours required for guard services. T & M states that no cardinal change was found in that case because the nature and purpose of the contract remained the same. The government responds that T & M's view of *Krygoski* is incorrect, that the contracting officer properly terminated the contract for the convenience of the government, and that summary judgment was proper.

■ We do not scrutinize *de novo* whether termination was the best course. In the absence of bad faith or clear abuse of discretion, the contracting officer's election to terminate for the government's convenience is conclusive. Such was our holding in *Salsbury Indus. v. United States*, 905 F.2d 1518, 1521 (Fed.Cir.1990) (quoting *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 325 F.2d 438, 442 (1963)), and in *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed.Cir.1995).

In *Krygoski*, we explained that *Salsbury* and *Caldwell* suggest an abuse of discretion standard informed by CICA's requirement for full and open competition:

Salsbury and Caldwell suggest that this court will avoid a finding of abused discretion when the facts support a reasonable inference that the contracting officer terminated for convenience in furtherance of statutory requirements for full and open competition.

*Krygoski*, 94 F.3d at 1544 (citing *Caldwell*, 55 F.3d at 1582; *Salsbury*, 905 F.2d at 1521). In *Krygoski*, where the contracting officer felt that a 25% to 33% increase in the contract price warranted re-solicitation, we applied the foregoing general principles and concluded that "the contracting officer had ample justification for conducting a re-procurement competitively under CICA." *Id.* at 1545.

■ While it is true that *Krygoski* involved a situation in which the contracting officer terminated the contract at issue because he believed that there had been a cardinal change, *see id.,* we did not hold that a cardinal change was a prerequisite for a valid termination for convenience. We instead relied upon the general principles that our case law has favored in the wake of CICA. *See id.* at 1543–44. These principles are reflected in *Caldwell,* a case that clearly did not present a "cardinal change" situation. *See* 55 F.3d at 1581. There, the contracting officer concluded only that a critical contract provision had been poorly drafted and that the error could not be remedied through an amendment. *See id.* Our affirmance in *Caldwell* makes it clear that a cardinal change is not a prerequisite for a valid termination for convenience. We today emphasize and confirm that proposition.

■ Having disposed of the incorrect premise upon which T & M's argument is based, we find no reason to disturb the Court of Federal Claims' determination that the contracting officer did not act improperly in invoking the termination for convenience clause. Specifically, there is nothing to indicate bad faith or abuse of discretion on the part of the contracting officer. It was not unreasonable for him to find that a 450 percent error in the original solicitation could have affected the pool of bidders.[3] That being the case, we are not prepared to say that he acted unreasonably or abused his discretion in

concluding that the circumstances called for a new procurement with corrected requirements to satisfy CICA's requirement of full and open competition.

We do not reach the issue of whether, as the Court of Federal Claims held, the error in the original estimate of the Navy's requirements that was discovered in late 1995 represented a cardinal change. We affirm on the sole ground that the facts "support a reasonable inference that the contracting officer terminated for convenience in furtherance of statutory requirements for full and open competition." *Krygoski,* 94 F.3d at 1544 (citing *Caldwell,* 55 F.3d at 1582; *Salsbury,* 905 F.2d at 1521).

■ Finally, T & M's reliance upon *Master Security* is misplaced. To begin with, we are not bound by decisions of the Comptroller General. *See Baggett Transp. Co. v. United States,* 969 F.2d 1028, 1032 (Fed.Cir.1992). In any event, in *Master Security,* the contracting officer declined to terminate an awarded contract for guard services and re-solicit the procurement after it was determined that more man hours of service were required than originally had been estimated. Denying the protest of a disappointed bidder who urged that there should have been a re-solicitation, the Comptroller General refused to disturb the contracting officer's discretionary decision. The deference exhibited by the Comptroller General in *Master Security* is consistent with our reluctance to disturb the contracting officer's decision in this case.[4]

---

3. Mr. Daly's declaration that he personally does not typically rely upon such estimates is irrelevant to the contracting officer's exercise of independent judgment.

4. As a backup to its main argument, T & M contends that *Krygoski, Caldwell,* and *Salsbury* have improperly narrowed *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756 (1982). According to T & M, "the *Torncello* court effectively held that some change in the circumstances at the time of contract award must occur to warrant a termination for convenience." T & M asserts that no such change in circumstances occurred in this case. We have in fact rejected the suggestion

that dicta of a plurality opinion in *Torncello* imposed a special requirement of "changed circumstances" on the government's right to terminate for its convenience. *See, e.g., Krygoski,* 94 F.3d at 1543–45. As we stated in *Salsbury,* "[*Torncello*] stands for the unremarkable proposition that when the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause." 905 F.2d at 1521, *quoted in Caldwell,* 55 F.3d at 1582. We reject T & M's argument that *Krygoski, Caldwell,* and *Salsbury* have improperly narrowed the holding of *Torncello* and that only changed circumstances may support a termi-

## III

■ T & M contends that the Court of Federal Claims abused its discretion in denying T & M's requested discovery. Bad faith and abuse of discretion are inherently fact-based determinations, it argues, yet the court improperly based its grant of summary judgment solely upon government evidence not subject to cross-examination. T & M posits a number of questions [5] that it maintains can be answered only by the government. T & M argues that, in the absence of a meaningful opportunity to conduct relevant discovery, the trial court erred in granting summary judgment.

The government responds that, to avoid summary judgment, T & M must demonstrate that it was denied discovery on a genuine issue of material fact. The government argues that none of the unanswered questions posited in T & M's brief are material, particularly because it is not the province of the courts to decide whether termination was the "best" course. Because T & M has not identified any required discovery relevant to material issues, the government maintains that summary judgment was appropriate.

We agree with the government that the questions posited by T & M do not raise any genuine issues of material fact. The Court of Federal Claims was not obliged to deny summary judgment merely to satisfy a speculative hope on T & M's part of finding some evidence that might tend to support a claim. *See Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed.Cir.1984) (denying plaintiff's discovery request inquiring into defendant's knowledge of instances of actual product confusion in trademark infringement action, and refusing to deny defendant's motion for summary judgment, merely to satisfy plaintiff's "speculative hope of finding some evidence that might tend to support a complaint"). This is particularly true in the present case, where the requirements of CICA objectively support the actions taken by the contracting officer. Moreover, government officials are presumed to act in good faith, and "it requires 'well-nigh irrefragable proof' to induce the court to abandon the presumption of good faith dealing." *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976), *quoted in Torncello*, 681 F.2d at 770, *quoted in Caldwell*, 55 F.3d at 1581. T & M cannot defeat summary judgment and obtain discovery with just bald assertions and speculation of wrongful conduct. *See Pure Gold, Inc.*, 739 F.2d at 627; *see also Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 772–73 (D.C.Cir.1981) ("There is [ ] no evidence whatever to support appellant's bald allegation.... Such unadorned speculation will not compel further discovery or resist a motion for summary judgment.") The Court of Federal Claims did not abuse its discretion in proceeding to summary judgment without the discovery sought by T & M.

## CONCLUSION

For the foregoing reasons, the judgment of the Court of Federal Claims is affirmed.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*

---

nation for convenience. Our cases have properly read *Torncello*.

**5.** For example, T & M wants the opportunity to ask Navy personnel why the requirements in the original solicitation were so grossly underestimated.