**SPACE MARK, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–771C.

United States Court of Federal Claims.

Nov. 9, 1999.

Philip M. Dearborn, Washington, D.C., for plaintiff, Pamela J. Mazza, Antonio R. Franco, and Robert S. Gardner, of counsel.

Kevin W. McArdle, U.S. Department of Justice, Washington, D.C., with whom were Assistant Director H. Anikeeff, Director David M. Cohen, and Acting Assistant Attorney General David W. Ogden, for defendant, Sharon A. Jenks, U.S. Air Force, of counsel.

## OPINION

FIRESTONE, Judge.

This case arises from a solicitation issued by the Air Force for a Communications and Information Management contract at Los Angeles Air Force Base. The solicitation was part of a two step process aimed at determining whether the services described in the solicitation could be performed more economically by a private contractor when compared to the costs of the Air Force's in-house personnel performing the same work.[1] In this action brought pursuant to 28 U.S.C. § 1491(b)(1) (1994 & Supp. III 1997), plaintiff, Space Mark, Inc. ("SMI"), the contractor that won the private competition challenges the Air Force's final cost comparison, which concluded that the Air Force's in-house organization could perform the work more economically than SMI. SMI contends that the Air Force's cost comparison was flawed procedurally and contains mistakes in violation of the relevant sections of OMB Circular A–76 and its Supplements, as well as 10 U.S.C. §§ 2304, 2462, 2468 and 32 C.F.R. Parts 169 and 169a.

## FACTUAL BACKGROUND

The facts are set forth in the Administrative Record filed with the court on September 27, 1999. On November 25, 1998, the United States Air Force, acting through the Los Angeles Air Force Base Space and Missile Systems Center ("Air Force"), issued Solicitation No. F04693–98–R–0006 ("Solicitation") seeking proposals for the performance of communications and information management services at the base for a five-year term. The performance requirements were set forth in a Performance Work Statement ("PWS") accompanying the Solicitation.

The Air Force issued the Solicitation in support of a cost comparison study it was conducting under OMB Circular No. A–76,

---

1. A variety of statutes and regulations govern how the Department of Defense is to compare the cost of private contractors providing supplies and services with the cost of the government providing those same goods or services. *See* 10 U.S.C. § 2462(b) (1994); Office of Management and Budget ("OMB") Circular A–76 and its Supplement. This action centers on the Air Force's compliance with those statutes and regulations.

which states that it is the general policy of the federal government to rely upon commercial sources to provide the products and services the government needs. *See* 48 Fed. Reg. 37,110, 37,114 (1983). OMB Circular No. A–76 also provides that in-house performance of a commercial activity is authorized if a "cost comparison" demonstrates that the federal agency is operating *or* can operate the activity at a lower estimated cost than a qualified commercial source. *See id.* at 37.115.

The Air Force designed the subject cost comparison study to determine whether the services described in the PWS could be performed more economically by the Air Force's "most efficient, cost effective organization" or "MEO"[2] capable of performing the services, or if a commercial source could perform the services more economically. The Solicitation indicated that the competition would be divided into two stages. First, there would be a competition among commercial sources to select the lowest-priced, technically acceptable proposal. Second, the prevailing commercial source's proposal would be evaluated against the MEO's proposal. The Solicitation, as amended, set February 25, 1999, as the due date for proposals from both the private contractors and the MEO.

On December 9, 1998, the Air Force conducted a pre-proposal conference with potential contractors, including SMI. At the conference the Air Force gave the attendees information about the competition and the cost comparison procedures set forth in OMB Circular No. A–76; the Circular No. A–76 Revised Supplemental Handbook (March 1996) ("A–76 Supplemental Handbook"); Department of Defense Instruction ("DODI") 4100.33; Air Force Pamphlet ("AFP") 26–12; Supplemental Guidance to AFP 26–12 issued

September 6, 1996; and Air Force Manual ("AFM") 64–108.

In accordance with the above-noted requirements, SMI submitted a timely proposal prior to the February 25, 1999 deadline. The Air Force also submitted their MEO proposal by February 25, 1999. The Air Force, however, revised the MEO proposal on April 22, 1999. It was the April 22, 1999 revised MEO proposal that the Air Force used to compare costs.

During March 1999, the Air Force's Source Selection Team performed an evaluation of proposals submitted by commercial sources in response to the solicitation. Following its evaluation, the Source Selection team determined that SMI's proposal was the only technically acceptable proposal. The Source Selection Team asked SMI to submit a final proposal for a cost comparison with the MEO's in-house cost proposal, which was to take place on April 23, 1999. On or about April 21, 1999, SMI submitted its final revised proposal.

On April 23, 1999, the Air Force's Contracting Officer ("CO") conducted the cost comparison and in accordance with the regulations publicly announced the results. SMI attended the public announcement. The CO first opened SMI's final revised proposal, which reflected a total price of $15,324,374. The CO then opened the Air Force's revised MEO cost comparison worksheet, which indicated that the MEO's final in-house cost estimate was $18,208,353. Because adjustments must be made to do a final comparison, the CO entered SMI's price information on the requisite OMB cost comparison worksheet. The data on the cost comparison worksheet was then entered into OMB's "COMPARE" computer program.[3] The program generated a new worksheet indicating that in-house performance was more econom-

---

**2.** The MEO is not the existing in-house organization, but the organization the agency would establish if it were competing for the work. In other words, the existing organization is allowed to make itself more efficient in order to compete. The A–76 Supplemental Handbook provides that "[a]gencies may consider existing management reinvention, consolidation, re-engineering, personnel classification, market and other analyses in the identification and development of the MEO." OFFICE OF MANAGEMENT AND BUDGET, CIRCULAR

No. A–76, REVISED SUPPLEMENTAL HANDBOOK 11 (1996) [hereinafter A–76 SUPPLEMENTAL HANDBOOK].

**3.** COMPARE is a system designed to assist in developing, documenting and comparing the relative costs of operating commercial activities in-house and by contract. The Air Force uses this computer program to make the final determination of whether to make award to a private contractor or keep the activity in-house.

ical than contractor performance by $274,232. Based on these results, the CO announced the Air Force's tentative cost comparison decision in favor of the MEO. The decision would not become final, however, until SMI exhausted its administrative appeals.

In accordance with the Air Force's rules governing the cost comparison process, SMI received a copy of the tentative cost decision on May 3, 1999. The Air Force contends that it also sent SMI a copy of all of its supporting documentation, including a copy of the February 1999 initial proposal and the explanation of the changes to the April 1999 proposal. Under the Air Force's regulations, the February 1999 proposals and the change sheet should have been disclosed at the April 23 public announcement.[4] It is not disputed that the Air Force did not publicly disclose that it had amended the February 1999 MEO proposal at the April public announcement, as required by the Air Force's procurement regulations. In addition, SMI contends that it never received a copy of these documents in the May package.

On May 12, 1999, SMI submitted a timely appeal of the Air Force's tentative cost comparison decision to the CO, based on the limited information it claims it had received. In its appeal SMI challenged the tentative cost comparison decision on two grounds. First, SMI asserted that the Air Force had violated OMB Circular No. A–76 and the A–76 Supplemental Handbook by adding the cost of three quality assurance evaluators ("QAE"), at a pay grade of GS–12, to SMI's proposed contract administration costs. Second, SMI challenged the Air Force's decision to add the relocation costs of 13 employees to SMI's proposed costs.

In accordance with AFP 26–12, the Los Angeles Air Force Base Cost Comparison Review Team heard SMI's appeal. The Review Team was made up of independent evaluators who did not participate in the cost comparison or evaluation of the April proposals. The Review Team denied SMI's appeal on May 30, 1999.

Thereafter, on June 2, 1999, SMI filed a protest with the General Accounting Office ("GAO") contesting the Air Force's cost comparison decision. After the protest was filed, the Air Force and SMI entered into a settlement agreement in which SMI agreed to withdraw its GAO protest and pursue its final administrative appeal to the major command under Section 15–2 of AFP 26–12. *See* AFP 26–12, *supra*, at 74. Pursuant to the terms of the settlement agreement, SMI submitted a major command-level appeal of the Air Force's cost competition decision to the Air Force Materiel Command ("AFMC"), on June 7, 1999.

In its June 7 appeal, SMI reiterated the arguments raised in its May 12, 1999 Air Force Base Review Team appeal. Once again, SMI argued that the Air Force impermissibly had added the cost of three quality assurance evaluators to SMI's contract administration costs. SMI asserted that the inclusion of QAE costs in the contract administration category was not authorized under the applicable regulations. SMI also asserted that to the extent such costs are authorized, the Air Force's inclusion of such high-salaried employees (three GS–12s) was unsupported. SMI also challenged the Air Force's relocation numbers. SMI argued that under its reading of the record and its understanding of the existing organization, only five employees would need to be relocated.

The AFMC issued its draft report to SMI and other interested parties on August 6,

---

4. Under the relevant regulations, the Air Force is allowed to make changes to an initial MEO proposal as long as the changes are made on a revised cost comparison form, sealed in a separate envelope, and explained when all the envelopes are opened at the public bid opening. U.S. DEP'T OF THE AIR FORCE, AF PAMPHLET 26–12 at 71 [hereinafter AFP 26–12]. SMI contends that these procedures where not followed. Specifically, plaintiff argues that it did not learn of the changes to the original cost comparison until it received the appellate tribunals' (the Air Force Materiel Command's) draft report. It is not disputed that the Air Force did not read the Government's explanation of the revisions that had been made to its original in-house cost estimate at the public announcement of the results. SMI did, however, finally receive a copy of the changes made to the original in-house cost estimate and all supporting documents prior to filing its final comments to the Air Force's final appeal tribunal. The appeal tribunal addressed SMI's comments and it is that tribunal's final decision that is now before the court.

1999. The draft report indicated that AFMC planned to deny SMI's appeal and asked for comments. SMI submitted comments to the AFMC on August 12, 1999.

In its comments, SMI reiterated its earlier grounds for appeal. In addition, SMI asserted new grounds based on its contention that it had just learned about the earlier February 1999 MEO proposal. SMI argued that the February proposal together with the explanation of the changes contained new information that raised additional areas of concern. Specifically, SMI alleged that draft report showed that (1) the Air Force improperly had changed the February 1999 MEO cost proposal after it had been submitted and delivered to the CO; and (2) the Air Force failed to disclose the changes to the MEO cost proposal at the time of the cost comparison and public announcement on April 23, 1999, in contravention of the Air Force's regulations.[5]

In response to SMI's comments, the CO prepared a statement in support of the Air Force's calculations. In addition, the AFMC asked for and received affidavits from the Air Force personnel involved in preparing the MEO cost proposals, concerning the events surrounding preparation and submission of the revised April 1999 MEO cost proposal.[6]

On September 3, 1999, the AFMC issued a final decision denying SMI's appeal. As is relevant to this action, the AFMC ruled as follows. First, it rejected SMI's contention that the Air Force improperly had included three QAEs in the contract administration function. The AFMC agreed with SMI, however, that the Air Force had not justified three GS–12 QAEs. The AFMC held that the Air Force QAEs should instead consist of only two GS–12s and one GS–11. As a result, the AFMC reduced SMI's cost by $70,569. Second, the AFMC rejected SMI's contention that the Air Force had miscalculated the number of employees to be relocated. The AFMC determined that the Air Force had not manipulated the relocation data and that the record supported the decision to relocate 13 employees. The AFMC explained that SMI's reliance on the existing organization data was misplaced because the existing organization is only part of the calculus, and as a result, conclusions could not be drawn from data about the existing organization. Rather, the relocation numbers were based properly on the revised personnel estimates needed for the MEO. The AFMC concluded that the Air Force had justified its conclusion that 13 employees would need to be relocated by privatizing the work.

The AFMC then went on to consider whether any of the 13 employees might retire or accept a right of first refusal,[7] such that the number should be reduced. The AFMC apparently asked the affected employees' supervisors to determine whether any of the 5 employees potentially eligible for retirement would be interested in retiring, and none expressed a definite interest. The Air Force did not have any information regarding whether any of the 13 would exercise their right of first refusal. This led the AFMC to apply the Command's generic statistics of 10.11%. Applying the 10.11% to the 13 reduced the number of employees to be relocated to 12. The AFMC then reduced SMI's costs by $52,000.[8]

5. In its comments, SMI also contended, for the first time, that the Air Force had misapplied OMB's inflation factors when adjusting the Air Force's personnel costs. The AFMC did not consider this contention on the ground that the argument was not timely raised. Although SMI originally included this inflation count in its complaint before this court, the count was voluntarily dismissed by stipulation of the parties filed October 28, 1999.

6. The AFMC received affidavits from Sandra C. Semrod, Richard R. Ross, Jr., Patrick E. Britton, Patricia McBride, and Louis Copeland, Jr. The affidavits describe in detail the process the Air Force followed in preparing the revised MEO proposal.

7. Under the applicable regulations, existing government employees adversely affected by an award to a private contractor must be given a right of first refusal to keep their job with the new private contractor, if they wish. *See* 48 C.F.R. § 52.207–3 (1991).

8. SMI has not questioned the AFMC's decision to examine possible retirements or its contention that only 10% of the 13 might exercise a right of first refusal. At argument, SMI suggested for the first time that more displaced employees might join SMI if it received award. There is nothing

Finally, the AFMC reviewed SMI's allegation that the procedural irregularities in the development of the April 1999 MEO cost proposal mandated reversal. After requesting affidavits from each of the key participants in the MEO process and examining those affidavits in detail, the AFMC concluded that while the Air Force may have committed errors, there was no evidence to show that the process had been compromised. The AFMC stated as follows: "Although procedural errors are readily apparent, the documentation shows that there was no gaming of the process and there were no procurement integrity violations. All of the allegations were answered." The AFMC explained that at no time were the individuals responsible for preparing the MEO proposals aware of SMI's costs and that the reasons for the changes between February 1999 and April 1999 were all valid. The net result of the AFMC's decision was that the cost differential in favor of the MEO was reduced to $151,663, from the pre-AFMC decision of $274,232.

By memorandum dated September 3, 1999, AFMC notified SMI that the final decision of the Air Force was to uphold the CO's cost comparison decision and to proceed with implementation of the MEO. By memorandum dated September 8, 1999, the AFMC instructed SMC to cancel the Solicitation and take appropriate action to implement the MEO.

On September 17, 1999, SMI filed its complaint and motion for a temporary restraining order in this court, challenging the September 3, 1999 AFMC decision and seeking to enjoin the Air Force from implementing the MEO.[9] On September 21, 1999, the Air Force agreed to wait 60 days before taking any action adverse to SMI. The matter was briefed, and the court heard oral argument on November 3, 1999.

## DISCUSSION

### I. The Scope and Standard of Review

 The court's jurisdiction over this action is provided for under the Tucker Act, 28 U.S.C. § 1491(b)(1).[10] Under that statute, review of a post-award bid protest action is based on the administrative record developed before the relevant contracting agency, which in the case is this Air Force.[11] In this action,

in the record or SMI's affidavit to support this contention.

9. SMI filed an affidavit in support of its request for an injunction. The court has reviewed that affidavit in evaluating SMI's request for preliminary relief. Defendant's motion to strike the affidavit is denied.

10. Defendant argues that this court's jurisdiction over alleged violations of statutes or regulations in connection with a procurement or a proposed procurement does not extend to violations of OMB Circular A–76 itself. Defendant agrees, however, that because SMI's complaint is based on alleged violations of the statute governing cost comparisons, 10 U.S.C. § 2462(b), SMI has stated a basis for jurisdiction and relief. *Cf. Diebold v. United States*, 947 F.2d 787, 801–02 (6th Cir. 1991), *reh'g denied*, 961 F.2d 97 (6th Cir.1992). Because all of SMI's substantive and procedural challenges stem from the statute, the court need not reach the issue of whether alleged violations of OMB Circular A–76 by itself gives rise to a claim.

Plaintiff also argued that the court has jurisdiction to hear its claims based on the government's breach of the implied duty to fairly and honestly consider SMI's proposal. The court need not reach this issue because, as stated above, the court has jurisdiction to hear plaintiff's claims under 10 U.S.C. § 2462(b). The court notes, however, that the Administrative Dispute Resolution Act's grant of bid protest jurisdiction to this court has been construed as "superced[ing] th[e] fiction" of an implied contract. *See CCL Service Corp. v. United States*, 43 Fed.Cl. 680, 687 (1999).

11. It is settled that review of proposed award decisions ordinarily is limited to the administrative record. *See Cubic Applications, Inc. v. United States*, 37 Fed.Cl. 339, 342 (1997). There are, however, well recognized exceptions to that principle. *See id.* Here, SMI alleges that the record in this case is incomplete in that the Air Force made changes to its in-house cost proposal without notice to SMI, and therefore, SMI is entitled to discovery to explore the Air Force's decision-making process.

In particular, SMI contends that the Air Force may have improperly changed its in-house cost proposal in contravention of the rules governing the cost comparison process. As discussed above, SMI raised these same concerns in its final administrative appeal. In order to address these concerns, the Air Force's final review panel obtained affidavits from the Air Force personnel responsible for preparing the MEO cost proposal. These affidavits state that the Air Force followed the proper rules in making changes, and most importantly that they were not aware of the details of SMI's proposal before making any

this court is required to apply the standard of review prescribed in the Administrative Procedure Act, which authorizes a court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994); *see Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132 (Fed.Cir.1998); *Miller–Holzwarth, Inc. v. United States,* 42 Fed.Cl. 643, 649 (1999).

■ The aggrieved bidder has the burden to demonstrate that there is no rational basis for the agency's decision. *See Delbert Wheeler Const., Inc. v. United States,* 39 Fed.Cl. 239, 247 (1997), *aff'd,* 155 F.3d 566 (1998). The court may not substitute its judgment for that of the agency. *See IMS Servs., Inc. v. United States,* 33 Fed.Cl. 167, 179 (1995). The court only may interfere where it is clear that the agency's determinations were "irrational and unreasonable." *Id.* In addition, errors are only relevant to the extent the errors are prejudicial. *See Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999). If correcting an error would not materially affect the outcome of the decision, it does not provide a basis for relief. *See id.; Impresa Construzioni Geom. Domenico Garufi v. United States,* 44 Fed.Cl. 540, 547 (1999) It is with these principles in mind that the court turns to the merits of SMI's complaint.

## II. The Inclusion of Quality Assurance in Contract Administration Costs

■ SMI challenges as arbitrary and unreasonable the Air Force's decision to include in its cost comparison the costs of three quality assurance evaluators at the GS–12 and GS–11 level to oversee the private contractor's performance. In SMI's view, quality assurance costs are common to both the government and a private contractor and should not have been considered as an added cost to SMI's proposal. SMI further states that, in any event, the inclusion of three QAEs at such high GS levels is unsupportable when examined against the contract administration requirements of the solicitation.

The AFMC determined that these three positions were created for the purpose of assuring contractor compliance with contract terms and conditions and were therefore properly included as contract administration costs under the OMB Circular A–76 Revised Supplemental Handbook, which states that contract administration costs "includes the cost of reviewing compliance with the terms of the contract. . . ." *See* A–76 SUPPLEMENTAL HANDBOOK, *supra,* at 25. Additionally, the AFMC determined that the QAE duties are not common to both contract and Government performance, as required by the OMB Handbook. *See RTS Travel Services,* B–283055, 1999 WL 754536, at *3 (September 23, 1999). The AFMC determined that Air Force regulations support a ratio of 3 contract administrators for a 51–person commercial operation. In addition, the AFMC noted that a review of the QAE Core Personnel Documents ("CPD") reveals that these three positions are intended to provide contract administration for each of three areas of performance; namely, Visual Information Services, Communications and Computer Systems, and Records Management. The AFMC concluded that these positions would

changes to their own. In addition, they explain that they followed established procedures for submitting a final proposal for comparison.

As discussed *infra,* SMI has not presented any evidence for the court to question these submissions. Indeed, affidavits of this sort would be precisely what the court would have ordered to address SMI's concerns about possible procedural violations in the process. Without something more to suggest that these statements are not true, the court denies SMI's request for discovery.

SMI's contention that the administrative record should not include the affidavits filed before the AFMC also is without merit. SMI argues that these affidavits are post-decisional and not relevant. To the contrary, all of the documents collected before the Air Force, including those added during the AFMC appeals process, are part of the administrative record. The AFMC was the final Air Force decision-making entity. The AFMC was empowered to change the Air Force's tentative decision and indeed it did. It is the AFMC decision that is before this court. Accordingly, the affidavits presented to the AFMC are not post-decisional but are properly before this court as a part of the administrative record. *Cf. Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 419–20, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

not be needed if the work were not contracted out.

The court finds that the inclusion of three QAEs was rational and consistent with the applicable regulations. As a review of the CPDs reveals, the QAEs are required to perform contract administration functions including: certifying invoices, verifying claims, approving contract payments, and interfacing with the CO on negotiating contract changes. These tasks are clearly identified as contract administration functions in the A–76 Supplemental Handbook and AFP 26–12.[12] The fact that these same employees also are tasked to perform certain quality assurance functions does not disqualify them as contract administrators. *See RTS Travel Services,* 1999 WL 754536 at *3. Where quality assurance functions are performed in the context of other contract administration functions, they properly may be included as contract administration costs. *See id.* Accordingly, the Air Force's decision to include these positions as contract administration costs is not arbitrary, capricious, or otherwise not in accordance with law.[13]

SMI also challenges the GS levels the Air Force has assigned to these QAEs. In particular SMI argues the QAEs should be only GS–9s and that the inclusion of quality assurance responsibilities in their CPDs resulted in unnecessarily high contract administration costs. In its decision, the AFMC explained that it called for an independent review of CPDs by a position classification specialist at the Headquarter's level and that this review supported a change from 3 GS–12s, as originally provided for in the MEO proposal, to two GS–12s and one GS–11. The AFMC further explained that the independent reviewer examined each of the "factor levels" assigned to the three positions and that the factor levels supported two GS–12s and one GS–11.

Although SMI suggests that the Air Force could have fulfilled these functions at a GS–9 level, it has not provided the court with a basis to substitute its judgment for the AFMC's final classification decision. The AFMC determined, based on an independent review, that the CPDs supported two GS–12 classifications and one GS–11 classification.[14] The decision is supported by the record and has not been shown to be arbitrary, capricious or otherwise not in accordance with law. Accordingly, defendant is entitled to summary judgment on the administrative record on this issue.

12. Under A–76 guidelines, "contract administration" includes "the cost of reviewing compliance with the terms of the contract, processing payments, negotiating change orders, and monitoring the closeout of contract operations [but] does not include inspection and other administrative requirements that would be common to contract and Government performance to assure acceptable performance." A–76 SUPPLEMENTAL HANDBOOK, *supra,* at 25. Similarly, Air Force guidance provides that contract administration costs include "the cost of reviewing contractor performance for compliance with the terms of the contract (quality assurance surveillance), processing contract payments, negotiating contract changes, and monitoring the closeout of contract operations." AFP 26–12, *supra,* at 55.

13. *RTS Travel* involved a solicitation and award in which the protestor challenged the costs attributed to the addition of a QAE. Specifically, the protestor argued that the costs added to its price were excessive because the Air Force incorrectly designated a QAE position as a GS–7 and as a .5 "Full Time Employee." The GAO denied the protest because it could not find any basis to conclude that the agency erred in how it estimated contract administration costs based on its review of the tasks to be performed by the QAE. *RTS Travel,* 1999 WL 754536 at *3–4.

SMI argues that *RTS Travel* is distinguishable because in the instant case SMI has demonstrated that the selected grade levels for the QAEs are unreasonably high because they are based on the QAEs performing quality assurance tasks that do not fall within the purview of contract administration and which are to be performed by the contractor. Unlike the protestor *RTS Travel,* SMI points out that it also has suggested an alternative grade level of GS–9 for the QAEs. The court does not agree. As explained in the text, SMI has not established that the quality assurance tasks were included incorrectly in contract administration costs and has not given the court a sufficient basis for substituting its judgment for that of the independent review the AFMC conducted to determine the appropriate level of pay for the QAEs.

14. At oral argument SMI suggested for the first time that these QAEs may also have responsibilities under other contracts. The Air Force explained that the QAEs would not be working on other contracts. In addition, SMI's argument was not timely raised and therefore was not considered.

## III. The Inclusion of Relocation Costs for 12 Employees

■ SMI argues that the administrative record does not support the AFMC's conclusion that privatizing the PWS would result in 12 relocations. SMI contends that data on the existing work force shows that only 5 existing employees would need to be relocated and that after applying the Air Force Command's general 10.11% "right of first refusal" statistic to the 5 employees, SMI should be responsible for only 4 relocations. SMI suggests that the data it relies upon is more realistic.

As discussed above, the AFMC addressed this argument in its decision, explaining that SMI was wrong to rely on data about the existing organization when SMI argued previously that only 5 existing employees would need to be relocated. As the AFMC stated: "The only position data relevant to the placement of employees is position data from the MEO, and not the original organization."

The court has no basis to question this conclusion. The affidavits presented to the AFMC and included in the administrative record explain that the Air Force's original estimate of 4 relocations in the February 23, 1999 MEO proposal was based on an error by Technical Sergeant ("TSgt.") Britton. TSgt. Britton states that he erroneously had reduced the estimate of 13 relocations to 4 based on a study that was no longer applicable, and that once he discovered the error it was corrected. The court has no reason to question TSgt. Britton's statement. It seems clear that TSgt. Britton's decision to reduce the 13 relocations to 4 was his own and that the Air Force never deviated from its original estimate. The fact that TSgt. Britton does not explain who brought the error to his attention is not relevant. It appears that it was simply a mistake and that it was properly corrected. The administrative record shows that Ms. McBride, an Air Force Personnel Management Specialist with 24 years of experience, made the original estimate of 13 relocations and subsequently confirmed the estimate in August 1999, before she filed her affidavit. Ms. McBride states in her affidavit:

> I determined ... that 13 employees in the Communications Squadron might be displaced if the cost comparison resulted in a decision to contract out the function. This decision was reached after reviewing the qualifications of the 13 employees to determine the positions on the base for which they qualified.... We determined that since such employees possessed unique, singular skills, in their current positions and as reflected from the experience recorded on their experience briefs, they would not be in a position to bump and retreat....
>
> As far as I am concerned, the number of employees to be relocated has not changed since 5 November 1998 when I sent to Sandra Semrod, Chief of Manpower, an e-mail confirming such number. It was 13 at the time of the initial determination and has remained the same according to Civilian Personnel Office records.[15]

Although Ms. McBride's explanation is not as comprehensive as the court may like, it provides the court with an adequate basis for review.

The court is satisfied that the Air Force did not manipulate the data or otherwise change its estimate in response to SMI's proposal. The Air Force determined that 13 employees would need to be relocated. The work was privatized and that estimate was confirmed. Given the level of expertise necessary to conduct those functions, SMI has not shown that Ms. McBride's conclusion is arbitrary or capricious. The AFMC reduced the estimate to 12 employee relocations based on the Command's 10–11% statistic regarding rights of first refusal. SMI has not questioned the use of the Command's statistic.

Thus, while the court can appreciate SMI's hope that a lesser number of relocations could be sustained, SMI has not presented the court with any basis to question the Air Force's determination. Accordingly, the Air

---

15. In view of Ms. McBride's statement, SMI's concern that the number should have been re-evaluated in April 1999 is unfounded. The relocation number was apparently re-evaluated in August 1999 before the AFMC issued its final decision.

Force is entitled to summary judgment on this issue, as well.

## IV. The Proceeding Before the AFMC Cured Any Errors in the Process.

Finally, SMI argues that the Air Force's failure to disclose publicly the February 1999 MEO proposal and to explain the changes in the April 1999 MEO proposal, when the April MEO proposal was first announced was so prejudicial as to undermine the integrity of the entire decision-making process. SMI argues that the affidavits filed by the AFMC to explain these errors are not sufficient to cure these deficiencies. The court disagrees. Although there is no doubt that the Air Force violated its own procedures by failing to announce publicly the earlier decision and the reasons for the changes at the April 23, 1999 cost comparison and public announcement, it is also true that the Air Force corrected that error by providing SMI with the data and an opportunity to comment before finalizing its decision. Indeed, the final decision addresses SMI's comments and endeavors to answer SMI's arguments based on that new information. The AFMC received affidavits from all of the Air Force personnel who participated in the process and none of the affidavits raise any questions about the integrity of the process.

 As a general rule, agencies have a right to correct their errors and may even reverse final decisions during an administrative appeals process. *See McAllister v. United States,* 3 Cl.Ct. 394, 398 (1983). The purpose of an administrative review process is to allow for such corrections. *See id.* The court finds that the appeal procedures provided to SMI in this case were sufficient to cure any prejudice SMI may have suffered in not learning of the February 23, 1999 MEO until its appeal before the AFMC. The record makes plain that prior to issuing a final decision, the AFMC ensured that SMI had both notice and an opportunity to present its objections based on a full record.

In such circumstances, SMI's contentions regarding the fairness of the process must be rejected. Absent clear proof of bad faith, this court will not abandon the presumption of good faith that attaches to government decisions. *See T & M Distribs., Inc. v. United States,* 185 F.3d 1279, 1283 (Fed.Cir.1999); *Spezzaferro v. Federal Aviation Admin.,* 807 F.2d 169, 173 (Fed.Cir.1986); *Crowley v. United States,* 208 Ct.Cl. 415, 527 F.2d 1176, 1191 (1975). There is no evidence in the record before this court to suggest any bad faith on the part of the Air Force's personnel involved in this matter. Accordingly, any errors in the process have been addressed and do not provide a basis for relief. SMI has had a full and fair opportunity to present its case.

## V. CONCLUSION

For all of the above-noted reasons, the court concludes that the Air Force's procurement decision was not arbitrary, capricious, or otherwise not in accordance with law. Accordingly, judgment for plaintiff on the administrative record and request for a permanent injunction is **DENIED** and judgment for defendant is **GRANTED**. The clerk is directed to enter judgment accordingly. Each party shall bear their own costs.

